**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL DOCKET NO. 5:17-cr-00390 |
| | : | |
| EDWIN PAWLOWSKI | : | HONORABLE JUAN R. SANCHEZ |

**MOTION TO DISMISS INDICTMENT**

**AND NOW**, the Defendant, Edwin Pawlowski, by and through counsel, Jack McMahon,

Esquire, hereby submits this Motion to Dismiss Indictment and avers the following:

1. Defendant was indicted on July 25, 2017 and charged with fifty-five counts: 18 U.S.C.

§371, 18 U.S.C. §1952 (three counts), 18 U.S.C. §666(a)(1)(b) (fourteen counts), 18 U.S.C.

§666(a)(2), 18 U.S.C. §1341 (nine counts), 18 U.S.C. §1343 (nine counts), 18 U.S.C. §1341, 46

(two counts), 18 U.S.C. §1343, 46 (six counts), 18 U.S.C. §1951 (three counts), 18 U.S.C. §1001

and 18 U.S.C. §2.

2. Defendant is scheduled for jury selection and trial January 16, 2018.

Dismissal for Prosecutorial Misconduct,
Investigative Abuses and Grand Jury Misconduct

A Grand Jury was empaneled by the Government to investigate Mayor Pawlowski and

others for possible corruption. The Grand Jury is to make an informed and independent decision

on probable cause. The best way to assure accurate information and true independence is

through witnesses with first hand knowledge testifying before the Grand Jury. This eliminates

the inherent problem of hearing evidence which is subject to the vagaries of recollection and

interpretation. Some hearsay is allowable by the courts but is certainly not the preferred method

of the courts.  Prosecutors cannot attempt to mislead the Grand Jury with incomplete and inaccurate information.  "A prosecutor should of course inform a Grand Jury of any substantial evidence of which the prosecutor is aware that negates an accused's guilt, and should respond candidly to a Grand Jury's inquiries."  United States v. Bari, 750 F.2d 1169, 1176 (2d Cir. 1984).  "Courts have also held that a prosecutor may not make statements or argue in a manner calculated to inflame the Grand Jury unfairly against an accused."  United States v. Hogan, 712 F.2d 757, 759 (2d Cir. 1983) (citing United States v. Serubo, 604 F.2d 807, 1818 (3d Cir 1979)).  Dismissal may be warranted "where the prosecutor's conduct amounts to a knowing or reckless misleading of the Grand Jury as to an essential fact."  Id. (affirming dismissal of indictment for soliciting false testimony).[1]

With this legal standard in mind an examination of the unchecked, unreliable, misleading and simply false narrative the Government attempted to portray is very illuminating and disturbing.  A good, fair and true investigation does not begin with a conclusion and then set out to find evidence that fits that conclusion and hide, cover-up and mislead on evidence that clearly negates the original conclusion.

Mike Fleck, one of Government's main cooperating witnesses, was working for Mayor Pawlowski on his campaign and as a consultant for other companies and individuals for business

---

[1]  "Although deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the Grand Jury's role."  United States v. Samango, 607 F.2d 877, 882 (9th Cir. 1979); see Hogan, 712 F.2d at 759 ("In fact the gain in prosecutors' influence over grand juries is all the more reason to insist that these limitations be observed strictly."); United States v. Udziela, 671 F.2d 995, 998 (7th Cir. 1982) ("[I]n cases where over-zealous prosecutors have manipulated a Grand Jury by willfully misleading it or knowingly presenting false evidence, courts have not hesitated to exercise their power to dismiss indictments."); see also Serubo, 604 F.2d at 817.

development.  Mike Fleck did not testify before the Grand Jury.  Agent Gleason on August 11,

2015 gave his "summary" of Fleck's admissions:

Agent Gleason: G.J. (August 11, 2015, pg. 10, lines 12 - 25 and pg. 11, lines 1 - 22)

Q.     Did Mr. Fleck eventually admit that he was involved in illegal activities?

A.     Yes.

Q.     Did he admit that he was involved in what are sometimes called pay-to-play schemes or quid pro quo schemes in Allentown and Reading?

A.     Yes, he did.

Q.     Did he admit that his schemes were actually conspiracies with people that included Ed Pawlowski in Allentown and Vaughn Spencer in Reading?

A.     Yes, he did.

Q.     Were these admissions by Mr. Fleck consistent with recordings that the FBI had reviewed that were obtained either through the court order Title 3 wiretap interception or through other means?

A.     Yes.

Q.     In fact, in addition to having court ordered telephone interceptions of phone calls that Mr. Fleck and others had, is it also true that since - - well, let me ask you this. Is it also true the FBI had hundreds, if not thousands, of recordings where someone associated with the FBI wore recorded devices for those conversations?

A.     That's correct.

Q.     Is it safe to say that numerous of those recordings contain evidence of these quid pro quo schemes through bribery, honest services schemes, these pay-to-play schemes that Mr. Fleck admitted?

A.     Yes.

Q.     And several of these involve Ed Pawlowski.  Correct?

First of all, the better, more accurate way to the truth would have been the first hand testimony of Mr. Fleck but the Government chose to proceed by an inferior way so they could continue the misleading of the Grand Jury regarding the true facts.  The discovery, including the recorded tapes provided, are clearly not consistent with their conclusory premise of pay to play. Agent Gleason's assertions on page ten of his Grand Jury testimony that Fleck admitted upon, being confronted by FBI, to pay-to-play schemes/quid pro quo with Mayor Pawlowski is simply false.  The Government knew it was false and yet allowed this summary, without the actual witness testifying, to be fraudulently put before the members of the Grand Jury.

Mike Fleck, after being confronted and solicited by FBI on May 10, 2015, agreed to cooperate and wear recording devices.  On March 12, 2015, Mr. Fleck was recorded, unbeknownst to him, by Sam Ruckelwicz when he met with his staff after meeting with FBI. This recording shows the fabrication of the above Grand Jury testimony and even more so, shows the innocence of the Government's target, Mayor Pawlowski.  (See Exhibit A).

This recording/transcript unequivocally demonstrates that the man closest to Mayor Pawlowski for the relevant times of this investigation says that Ed has never done anything wrong and he told the FBI this when they confronted him.  Despite this fact, "Ed doesn't ever do anything wrong," Mr. Fleck, in an attempt to save himself, agrees with Government to "set up" their pre-conceived target Mayor Pawlowski.  He also confirms that the Government is trying to make up crimes in an"overzealous" way.

This recording is shocking in demonstrating the Government's misguided, misleading, unfair and irresponsible investigation.  The Government knew from this close associate that the Mayor had never done anything wrong but agreed to use Mr. Fleck, and did use Mr. Fleck, for his

self-stated purpose of "setting up" the Mayor.

This conduct is outrageous for any responsible law enforcement agency but it is exacerbated by the Government's hiding this exculpatory evidence from the Grand Jury.  As stated earlier in Bari, a prosecutor should of course inform Grand Jury of evidence which may negate an accused's guilt.  In Serubo, dismissal may be warranted where the Government knowingly or recklessly misleads the Grand Jury.

What could be more misleading than not presenting to the Grand Jury the testimony from the target's closest associate that the Mayor doesn't do things wrong.  This is probably the person with the most knowledge of the conduct of the Mayor and yet the Government does not even put him before the Grand Jury and then withholds from the Grand Jury the clear evidence of Mayor Pawlowski's innocence.

If the foregoing isn't enough to show the irresponsible misleading of the Grand Jury, there is much more.

On June 29, 2015, the aforementioned Mr. Fleck, in his constant attempt to "set up" Mayor Pawlowski records a conversation with the Mayor.  The background of this recording is earlier that day, the Mayor met with Ramzi Haddad and picked up campaign contribution checks.  At that meeting, Ramzi inquired about the city buying or leasing the Banko building, which he owned, for public works storage.  The Mayor told Ramzi that, based on their due diligence, that it was not feasible.  Ramzi then complains to Mayor that Sam Ruckelwicz, by way of text, told him it was a done deal.  The Mayor told him it was not going to be a done deal despite what Sam represented.  The Mayor told him to delete that text because it was not true and would be misleading if someone saw it.  The following is the tape/transcript from the Mayor, with Fleck,

after the Ramzi meeting.  (See Exhibit B)

Again, this recording was never presented to the Grand Jury, a Grand Jury who eventually indicted the Mayor for "crossing the line" and acting "unethically" with Mr. Haddad.  It is even more egregious when you consider that the Government did play recordings from June 29, 2015 regarding Haddad (GJ April 11, 2017 pg 59 and 60; Agent Curtis).  The prosecutor chose to play a snippet of that day but intentionally did not play the Mayor saying, among other things, he "won't cross the line," "tell Ramzi, no if asks to cross line," "we shouldn't ever come close to crossing the line" and "we should do things ethically."  When trying to be accurate and fair in determining the "mens rea" of the Mayor in a criminal investigation, shouldn't the people making that decision have, from his own mouth, that he won't cross line and his intention for himself and everyone else associated with him is to act ethically.  This clearly is the type of misleading and improper Grand Jury investigation contemplated by Bari and Serubo.

Shockingly there is more of this misleading, misrepresentation and hiding the ball by the Government in this investigation.

On May 11, 2015 there is another secretly recorded conversation between the Mayor, Fleck and Ruckelwicz.  The background of this recording is a man by the name of Luke Cunningham, an electrical contractor, who had indicated to the Mayor that if he got more contracts, there would be more donations.  The following is a transcript of the Mayor's reaction to a clear request for pay-to-play.  (See Exhibit C)

The Government again, amazingly, does not inform the Grand Jury of the Mayor's direct rejection to a pay-to-play overture.  In deciding the "mens rea" of the Mayor in this investigation, wouldn't this be extremely probative and insightful?  The Government intentionally kept this

evidence, that negates the criminal mind set of the Mayor, from the people making that decision.

Further on May 20, 2015 another secretive recording was made involving Mr. Fleck and the Mayor.  The background of this recording is a meeting preceding the Mayor's anticipated pitch to Matt Sorrentino (Norris, McGlaughlin) to support him for Senate.  Mr. Fleck, who again has professed his desire to "set up" the Mayor, suggests an offer of legal work but the Mayor does not bite on this request and responds back that "would cross the line."  The following is a part of the transcript of that meeting and recording.  (See Exhibit D)

Again, like a broken record, wouldn't that have been crucial to grand jurors to attempt to fairly determine the mind set of Mayor Pawlowski.  A person who, according to the Government's false narrative, is all in on pay-to-play, would never be inquiring or debating if something does or doesn't cross the line.

The Government's questioning by way of hearsay evidence in front of the Grand Jury clearly demonstrates the conclusory mind set that permeated this Grand Jury investigation.

Examples of this are all through the hearsay testimony of Agent Gleason and Agent Curtis.  As far back as the initial stages of this Grand Jury investigation this method and philosophy was clear.

Agent Gleason:  G.J. (September 8, 2015, pg.5, lines 9 - 21)

Q.     I don't want you to - - the Grand Jury knows they're going to have those notes of testimony available for them to read, but to the extent that you may give some context to testimony and to calls they're going to hear, is it fair to say that Jonathan Saidel testified that he had a meeting in March of 2015 with Mayor Pawlowski and in his view Mayor Pawlowski solicited from him and Stevens & Lee a request for a contribution and linked it to renewing their relationship and getting Stevens & Lee work if, in fact, they gave a contribution?

Further, the Government then plays a consensual recording that in NO way supports the

Agents' conclusion.  (SR 347, 24, 25 26)

| Jonathan Saidel: | "How's it going? |
|---|---|
| Sam Ruchlewicz: | Hi and I hope all is well. |
| Jonathan Saidel: | Before we do the policy UI I can only you tell that Stevens & Lee says that they had nothing to do with anything that happened at Reading.  That they're - they were just the lawyers for City Council.  They would like to do some work for you.  And they - - |
| Ed Pawlowski: | Listen I - - |
| Jonathan Saidel: | They wanna be - - |
| Ed Pawlowski: | Unintelligible. |
| Jonathan Saidel: | They wanna be your close friends because I'm of counsel. |
| Ed Pawlowski: | Okay, Well listen, I, I've given them millions of dollars of work in the past and, and then they've, they basically ran over me with a giant bus and rolled over me a couple of times, which really - - |
| Jonathan Saidel: | But they said - - |
| Ed Pawlowski: | - - pissed me off. |
| Jonathan Saidel: | They said, okay, well they, I can only tell you what they said.  That they said that that wasn't the case.  They said it was, it was not them that did it but that they weren't the lawyers for the City... that's all I - - |
| Ed Pawlowski: | I've also asked them many times, you know, to help in other ways, and they turn around and like give me a hundred bucks. |
| Jonathan Saidel: | Well I think that, I think that, well, I'm gonna give you this because they asked me to and I will tell you that life is a two way street, which you and I both understand.  I will make sure - - |

Ed Pawlowski:         I understand you guys are Republicans but you know like when I ask you for City Council candidates and stuff you turn around and give me a hundred bucks, kind of pissed me off.

Jonathan Saidel:      I can only tell you think about that and I'm sure that they'll wanna be helpful in Allentown.  Okay?

Ed Pawlowski:         Well they've done, they, listen, they were doing all our special litigation.  Okay?  And they, I don't have a problem with the guy that they have.  He's done a good job.  Okay, but when they, when that thing happened with City Council, I was really pised off.  Cause, cause, I mean, they basically made a statement that I was corrupt or I was, you know, doing it for political gain.  I'm like, listen guys you think I'm doing this for political gain.  Okay?

Jonathan Saidel:      They actually told me that it turned out well for you, which I knew anyway.

Ed Pawlowski:         Of course it turned out well for me.  Yes.  It turned out very well for me, but you know, they made it sound, how, how you would describe it?

Sam Ruchlewicz:      Ummm... it was bad.

Ed Pawlowski:         Yeah, I mean, you know - -

Sam Ruchlewicz:      That was the second most upset I've seen you.

Ed Pawlowski;         Yeah.  I called the - - I mean I was pissed.  I called up Francis Acosta and he's like "Ohh, Stevens & Lee wrote it for us".  I'm like really?"

Ms. Winter:           Okay.  Now, going farther down with Jonathan Saidel picking up: "I can't imagine - - I can only tell you what they said, in the meantime they, they, I'm of counsel - - "

BY MS. WINTER:

Q.      What does Mayor Pawlowski say?

A.      "I'm willing, I'm willing to reconsider."

The Government knew when it presented this tape that Mayor Pawlowski's problem with Stevens and Lee was not an issue of contributions but an issue regarding the law firm's writing an extremely derogatory e-mail about the Mayor in regards to a water leasing project.  The conversation with Saidel was merely an attempt by Stevens and Lee to smooth over this conduct regarding the Mayor.  The Government knew this was the reason and substance of the meeting but conjured up false and misleading conclusions as evidenced by Agent Gleason's testimony.  This testimony is in reference to Counts 11, 12, 13 and 14.

Spillman-Farmer (Cts 8, 26, 32, 33) never contributed a dime to Mayor Pawlowski, yet on November 22, 2016, Agent Curtis was asked by AUSA Wzorek if he checked on any campaign contributions from the firm, the Agent responded in the affirmative but the Government never asked the next and most relevant question of whether there were any contributions.

Agent Curtis:  G.J. (November 22, 2016, pg. 7, lines 10 - 19)

Q.      Now, you've checked to see, I believe, whether there have been any campaign contributions to the Mayor's campaign from Spillman Farmer.  Is that right?

A.      Yes.

Q.      In fact, the contract was awarded to Spillman.  This is an award letter dated April 9, 2015 which is Grand Jury Exhibit Number 3 from today's date.  Is that right?

A.      Yes.

If the Government was being fair and not attempting to mislead the Grand Jury they would have developed the fact, that they clearly knew, that Spillman-Farmer, or their chief executive Joseph Biondo, never contributed to Mayor Pawlowski.

In addition to all of the above the Government failed to present to the Grand Jury numerous secretly recorded conversations where the Mayor, despite the best efforts of "set up" man Mike Fleck, consistently tells Fleck, Sam and Dougherty that he had done nothing wrong or illegal:

A)      MF 97 June 30, 2015:

- Sam was the problem
- Sam was pushing stuff to cross the line
- Mayor says it has to stop
- Mayor says they haven't done anything wrong
- Fleck says Fran crossed the line and Mayor says he should not be doing that

B)      MF 99 July 1, 2015:

- Mayor wants to stop this (Sam's actions)
- Mayor wants protocols to make sure not crossing the line
- Mayor says they don't need to cross the line
- Mayor says nothing worth crossing the line
- Mayor reiterates they did nothing illegal

C)      MF 102 July 2, 2015:

- Need to look over everything Sam did
- Mayor said Northeast Revenue competitive and not rigged
- Dougherty says he was perfectly content that the city never rigged a contract
- Mayor says he never engaged in quid pro quo with Norris McGlaughlin, never tied contributions to legal work
- Mayor says line may of been getting blurred because of Sam and that they should stop and redraw line and make sure that it is not allowed to get blurred.

The Government never presented this extraordinary exculpatory evidence to this Grand Jury. Exculpating and showing innocence of the Mayor was never part of the agenda of the Government. Dismissal is required for such egregious and irresponsible investigation and presentation.

- 11 -

So, in summary to this part of the Motion to Dismiss, the Government willfully withheld

from the grand jurors the following with regard to evidence of the mens rea of Mayor Pawlowski.

A)   <u>Mike Fleck Recording (March 12, 2015)</u>

    1) FBI agents may be "overzealous with making up crimes"
    2) Ed has "<u>never</u> done anything wrong"
    3) He has to go in there and <u>set him</u> (Mayor) up and nail <u>somebody</u>

B)   <u>Mike Fleck Recording (June 29, 2015)</u>

    1) Mayor will not come close to crossing line
    2) Mayor will tell Ramzi <u>no</u> if asks to cross line
    3) Sam is misrepresenting on Mayor's behalf
    4) Mayor says must act <u>ethically</u>

C)   <u>Mike Fleck Recording (May 11, 2015)</u>

    1) Mayor's refusal to agree to pay for play
    2) Mayor's insistence on going through regular contract process

D)   <u>Mike Fleck Recording (May 20, 2011)</u>

    1) Mayor concerned about conduct crossing the line

E)   <u>Mike Fleck Recording (June 30, 2015)</u>

    1) Mayor's statement of not doing anything wrong
    2) Sam is pushing the line and has to stop

F)   <u>Mike Fleck Recording (July 1, 2015)</u>

    1) Mayor wants protocols to make sure no crossing line, like Sam
    2) Mayor says don't need to cross the line
    3) Mayor says nothing worth crossing line for

G)   <u>Mike Fleck Recording (July 2, 2015)</u>

    1) Northeast Revenue not rigged; competitive
    2) No quid pro quo with Norris McGlaughlin
    3) Make sure blurring line (by Sam) should stop

The Government's misconduct in this investigation is not limited to the above fraudulent presentation to the Grand Jury.  The Government reached out and confronted Fleck on May 10, 2015.  This was more than a month prior to the Mayor's declaration for United States Senate. Knowing that Fleck had told them that the Mayor had never done anything wrong, the Government still recruited Mr. Fleck to advise and assist on the decision to run for the Senate which led to many of these charges.  Fleck's assistance to the Mayor was simply a sham to create an opportunity for him to help himself from his own illegal activity.  The Government assisting in such a sham against a man who they have been informed has never done anything wrong stretches the limits of Government ethics.  The Government's participation in this, in reality bogus campaign, put them square in a conspiracy to defraud contributors who believed they were giving to a real and viable campaign, not a campaign that was merely a vehicle for Mike Fleck to "set up the Mayor", "nail somebody" and hence extricate himself from his own illegal activity.

This corrupt partnership gets worse.  After the Government executed search and seizure warrants on Allentown City Hall, the cat was out of the bag, and Mike Fleck scurried away. However, before leaving for parts unknown (but known to the Government) Mr. Fleck wrote an unauthorized check from the Mayor's campaign funds for $76,500.  This was not authorized by the treasurer of campaign and was something he was not entitled to.  Nonetheless, the Government, since he was their "star" witness, allowed this theft to go on under their supposed watchful eye.

The Mayor complained of this theft causing counsel to send a letter to United States Attorney Zane Memeger (see letter to Zane Memeger attached as Exhibit E).  The Government never responded and with their inaction have given tacit approval to a major campaign theft.

- 13 -

Mr. Fleck has also been allowed by the Government to get away with a theft of campaign funds from the Mayor of Whitehall, Gerald Palagonia.  Mayor Palagonia had used Mr. Fleck as a campaign worker.  Mr. Fleck, without authorization, had PNC Bank to issue him a credit card from the account of "Friends of Jerry Palagonia."  Mr. Fleck then used the credit card for his own unauthorized use for over $14,000.  This again was all done under the watchful eye of the Government.  To date nothing has been done to Mr. Fleck for this theft.  Mayor Palagonia made complaints to Allentown Police Department, who then referred it to FBI who in turn did nothing because Mr. Fleck was their witness and working in conjunction with them at the time of theft. (See attached Police Report, Exhibit F)

The Government also turned a blind eye to another theft of the serial thief, Mike Fleck. Norris, McGlaughlin lawyers contributed to the Mayor's United States Senate campaign.  Four of these lawyers did so by way of credit card.  Mr. Fleck had the vendor for the credit card transaction be H Street Strategies, his own company, rather than the Senate campaign, Pawlowski 16.  This unauthorized and clandestine move, again under the Government's "watchful" eye, resulted in Mr. Fleck walking away into the sunset with another $17,000 plus.  Not surprisingly, given the Government's relationship with this thief, nothing was done.

The Government has also misrepresented and withheld critical facts from the grand jurors in connection with count seventeen and the Norris McGlaughlin/Scott Allinson incident.  On May 20, 2015 Mayor Pawlowski went to Norris McGlaughlin to make his campaign and contribution pitch to Matt Sorrentino, the managing partner of the firm.  Also present were Mike Fleck and Scott Allinson from the law firm.  This was secretly recorded by Mr. Fleck.  The

following is the transcript/recording of this recording.  (Attached Exhibit G) MF 58-3/4; June 15, 2015)

As anyone with modicum of fairness can see, there is absolutely nothing illegal or improper in this recording.  This was the Mayor's standard campaign/contribution pitch - why he pulled out of Governor race, Senator Toomey is vulnerable, no other viable Democratic candidates, his story on saving and revitalizing Allentown and an ending with a request to raise $25,000.  No demand, no quid pro quo, no forcefulness, just a typical campaign solicitation. This recording, which is the basis for count seventeen, was never played to the Grand Jury. Paragraph 29, page 27 of the indictment references this conversation and makes the false claim that Mayor Pawlowski said he might have more trust work for Norris McGlaughlin.  As the transcript indicates, there was no mention of future legal trust work.  The indictment's allegation is simply false.  It is also inconceivable that the recording, that reflects the true interaction between Norris McGlaughlin, was never played to the grand jurors.  Why wasn't it played?  The answer is clear.  The Government did not want the grand jurors to hear the actual words, the tone and complete innocence of the campaign solicitation.

As previously stated the courts have long recognized the preference for first hand accounts before the Grand Jury.  Misunderstandings, misinterpretations and straight-out falsehoods can be eliminated with such testimony.  Hearsay is clearly allowed but is not the best or most fair way to get to the truth.  It is with that concept in mind that we should analyze the integrity of this Grand Jury investigation.

Counts 6, 38, 39 and 48 involves alleged corruption and bribery in connection with a person named Ramzi Haddad.  The nuances of the Mayor's conduct with Mr. Haddad are critical

to the "official action" and "quid pro quo" legal analysis.  Amazingly Mr. Haddad, although

cooperating from almost the beginning, never testified before the Grand Jury.  It was left to the

Government agents to summarize the mind sets and actions that led to indictment.  Agents

reviewing the plea agreement of Mr. Haddad and some incorrect factual assertions were all this

Grand Jury had to rely on for these counts.  After receiving discovery it becomes clear why Mr.

Haddad was not called before the Grand Jury.  Four interviews with the FBI and at no time did he

ever mention the Mayor ever suggesting any "quid pro quo" or anything resembling it.  Mr.

Haddad in his interviews talked of his subjective belief that he needed to contribute to get stuff

done, he at no time ever indicated anything the Mayor did or said that would fit the mens rea,

quid pro quo necessary to indict.  Keeping this information and Mr. Haddad from the Grand Jury

is just further evidence of a clear and concerted effort to manipulate and mislead the Grand Jury.

Counts 2, 3, 4, 5, 20, 21, 22 and 23 are all related bribery and corruption in the awarding

of the tax collection contract to a company called Northeast Revenue.  The head of Northeast is

one John Rogers.  The Government, as appears to be a pattern, never requested Mr. Rogers to

actually testify before the Grand Jury.  Again a review of the discovery explains why the

Government did not call Mr. Rogers to the Grand Jury.  His FBI interviews reflect nothing

improper or illegal with Mayor Pawlowski.  In fact his interview specifically states he did

nothing illegal in connection with the awarding of the contract.  Why again did the Government

not want this important, relevant evidence in front of the grand jurors?  Obvious, it did not fit

their preconceived agenda about the culpability of Mayor Pawlowski.

Counts 15, 16, 27, 28, 34, 35, 36, 37, 40, 41, 42, 43, 44, and 45 all deal with the alleged

corruption and bribery in connection with the awarding of a major street lights contract to The

Efficiency Network (TEN).  Patrick Regan was the head of TEN.  Mr. Regan was the person who supposedly engaged in a bribery/corruption arrangement with Mayor Pawlowski.  Again, the Government did not give the Grand Jury the benefit of first hand knowledge and testimony.  A review of Mr. Regan's plea memorandum again clearly shows why the Government did not have him testify before the Grand Jury.  The plea memo clearly shows that there was absolutely no quid pro quo arrangement between Mayor Pawlowski and Mr. Regan.  A January 28, 2015 meeting between the two only shows the Mayor requesting Mr. Regan send him "performance contract language" for possible inclusion in the RFQ/RFP.  There was no request at any time by the Mayor to Mr. Regan for contributions in any way connected to the lighting contract.  The Government intentionally did not provide this important, relevant and critical evidence to the Grand Jury

Counts 18, 46 and 47 involve the awarding of a $35,000 contract to 5C, a security company.  The contract was for a review of cyber security of Allentown systems.  Jack Rosen was the lead individual with this company.  Mayor Pawlowski is charged with soliciting a bribe from Mr. Rosen.  The dynamic and interaction between Mr. Rosen and the Mayor is essential to determining the mens rea and potential quid pro quo issues that the Grand Jury had to resolve.  Mr. Rosen has never been interviewed by the FBI or called before the Grand Jury to enlighten the grand jurors as to the true facts regarding the contact and conversation he had with the Mayor.  The prosecution has a responsibility to present facts to the Grand Jury in a full, fair and impartial way.  This method of failing to interview or present this critical testimony shirks this responsibility and is just further evidence that the Government intentionally misled and

misrepresented to this Grand Jury to come to the conclusion that they had pre-ordained before the investigation even started.

Count 7 relates to a solicitation to bribes regarding the Dilworth law firm and Mark Feller and Joe Jacovini, partners in that firm.  The indictment refers to a June 15, 2015 meeting between Feller/Jacovini and the Mayor.  This conversation was secretly recorded.  Again it is just simply hard to believe, with the concept of fairness being the standard, that Mr. Feller was never called before the Grand Jury.  The secret recording, (MF - 86-04; June 15, 2015) was never played in its entirety for the Grand Jury to hear.  This recording shows absolutely no bribing, solicitation, quid pro quo or anything illegal.  (See Exhibit H)  The Government's failure to call Mr. Feller or play this recording is just further evidence that the Government had no intention to give the grand jurors the truth.  Manipulation and misleading was the constant mode of operation.

Counts 8, 26, 32 and 33 deal with a pool renovation contract given to Spillman-Farmer. Joseph Biondo is the head of Spillman-Farmer.  A contract was awarded April 9, 2015.  On June 24, 2015 the Mayor requested a campaign contribution for the United States Senate.  This request was over two months after the awarding of the contract.  Mr. Biondo testified they never contributed to the campaign and in fact testified that the Mayor was professional and never pressured Mr. Biondo.  A discussion of this testimony as to the actual charge of 18 U.S.C. §666 will be discussed later in this Motion.  However, it is included here to show just why the Government did not call to the Grand Jury all the witnesses on the other side of the quid pro quo. Mr. Biondo gives us a clear picture of just what happens when first person testimony is presented to the grand jurors without the Government manipulated interpretations.

Counts 9, 10, 23, 24 and 25 are in connection with the awarding of an engineering

contract to McTish & Kunkel for $35,000 for a project at Basin Street.  This contract was put out

for bid on December 13, 2013 and awarded April 2, 2014.  On December 30, 2013 Mr. McTish

contributed $1,000 to Pawlowski for Governor.  McTish was asked by the Mayor if he could help

him raise funds for his Senate campaign.  This conversation was again secretly recorded (SR 386

4/15) and the Mayor tells McTish about the great story he has to tell and McTish agrees to help

because of this story.  There is no quid pro quo, no bribery - no linking campaign contributions to

the Basin Street contract.  In fact, as the Grand Jury testimony (pgs. 40 - 43 of this Motion)

indicates, Mr. McTish was not happy with the lack of "results" his contributions were getting

(G.J. pg. 50 lines 5 - 21) and (G.J. pg. 59 lines 9 - 24) and (G.J. pg. 63 lines 4 - 21).

Again as we saw with Joseph Biondo, when first person testimony is presented, the

Government legal theory of corruption, quid pro quo and connecting contributions to contracts is

revealed as a truly false narrative.  After Biondo and McTish, it is no wonder why the

Government was manipulating the Grand Jury presentation by not presenting Ramzi Haddad,

John Rogers, Patrick Regan, Jack Rosen, Mark Feller and Matt Sorrentino.  However, if you

need anything more to demonstrate the complete intention of the Government to present their

preconceived agenda, despite the clear evidence already referenced, look no further than May 24,

2016 (N.T. pg. 67 lines 15 - 19).  The Grand Jury testimony and questioning of Mr. McTish on

May 24, 2016.

> Q.     However, in Reading and in Allentown, those were the only places where you had
> this explicit arrangement where you had to give campaign money in order to
> receive contracts?
>
> A.     Yes.

The question by the prosecutor regarding an "explicit agreement" with Allentown campaign contributions is simply false.  The evidence presented to the Grand Jury in connection with Mayor Pawlowski supports no such agreement.  A simple reading of the attached transcript tells you that is false.  The indictment alleged a contribution of April 27, 2015 to the United States Senate of $2,500, significantly less than the $21,000 requested and one year <u>after</u> the awarding of the Basin Street contract.

In summary, the Government has blatantly and intentionally disregarded their responsibility under <u>Bari</u>, <u>Serubo</u> by misleading the Grand Jury, withholding from the Grand Jury evidence negating the Mayor's corrupt intent and not presenting first hand information that clearly would not have supported their prejudiced agenda.

Withholding from the Grand Jury the following (not all inclusive):

A)   Mike Fleck's tape after being confronted by FBI where he states Government is "making up crimes in over zealous way"

(SR.   May 12, 2015)

B)   Mike Fleck's tape where he clearly states that he told FBI "Ed has <u>never</u> done anything wrong"

(SR.   May 12, 2015)

C)   Mike Fleck's tape where he indicates he has to "set up" the Mayor

(SR.   May 2, 2015)

D)   Mayor's conversation with Fleck on June 29, 2015 where he states that he won't "cross the line" regarding contributions

(MF 95; 6/29/15)

E)      Mayor's conversation with Fleck on June 29, 2015 where he states if asked to cross the line, "then just say no."

        (MF 95; 6/29/15)

F)      Mayor's conversation with Fleck on June 29, 2015 where he states "we shouldn't even come close to crossing the line"

        (MF 95; 6/29/15)

G)      Mayor's conversation with Fleck on June 29, 2015 where he states that if campaign can't be done right then maybe he shouldn't be in race

        (MF 95; 6/29/15)

H)      Mayor's conversation with Fleck on June 29, 2015 where he states that everything is to be done ethically.

        (MF 95; 6/29/15)

I)      Mayor's statement to Fleck and Ruckelwicz on May 11, 2015 where he specifically, clearly and uncategorically refuses Luke Cunningham's offer of more contributions for contracts

        (MF 46 - 04)

J)      Mayor's reference on May 11, 2015 to another pay-to-play request from Larry Segal from Reading and his complete disdain and disgust for such

        (MF 46 - 04)

K)      Mayor's statement to Fleck on May 20, 2015, prior to meeting with Matt Sorrentino, where expresses an unwillingness to engage in statements that might "cross the line"

        (MF 58 - 02, 03)

L)      The Government's collusion with Mike Fleck, as informant, to "set up" Mayor who had never done anything wrong, per Fleck

M)    The Government's collusion with Fleck after March 11, 2015 to engage Mayor Pawlowski to run for United States Senate (which was announced April of 2015) for the stated reason to "set him up" and provide a vehicle for Fleck to mitigate the penalty for his own illegal acts

N)    The Government collusion to induce and participate what in reality then was a bogus campaign and take money from donors knowing that there was never really going to be a viable campaign due to their actions and "investigation"

O)    The Government's complete disregard, while on their supervision, of Mike Fleck stealing $76,500 from a federal election campaign account

P)    The Government's complete disregard, while on their supervision, of the criminal act of obtaining a credit card, without knowledge of Mayor Palagonia and charging $14,000 of unauthorized items

Q)    The Government's complete disregard to Mike Fleck designating over $17,000 in campaign contributions to his personal business account

R)    The Government alleging a promise of trust legal work to Norris McGlaughlin when the recording of that meeting of May 20, 2015 never mentions that at all

S)    The failure to present first hand knowledge to the Grand Jury

        1)    Ramzi Haddad (Counts 6, 38, 39 and 48)
        2)    John Rogers (Counts 2, 3, 4, 5, 20, 21, 22 and 23)
        3)    Patrick Regan (Counts 15, 16, 27, 28, 34, 35, 36, 37, 40, 41, 42, 43, 44 and 45)
        4)    Jack Rosen (Counts 18, 46 and 47)
        5)    Mark Feller (Count 7)
        6)    Matt Sorrentini (Count 17)

      The power of the Government in a Grand Jury proceeding like this is enormous and with that power comes great responsibility to be fair, complete and forthright.  This responsibility, based on all of the above, has been put on the back burner to achieve a false result that was desired from the very beginning.  It has been said that a prosecutor, with the singular power to

manipulate evidence could even indict a ham sandwich.  Mayor Pawlowski now knows what it feels like to be that ham sandwich.

Dismissal - Counts Are Not Made Out as
Matter of Law - Facts Presented Do Not Substantiate Counts

A detailed analysis of the specific charges of the indictment against Mayor Pawlowski shows that, even at this preliminary level pursuant to Federal Rule 11 of Criminal procedure, that the Government's indictment does not meet the legal threshold for the crimes charged.  In addition, the Government has promulgated an indictment that does not comport to the evidence they presented to the Grand Jury.

The leading case for addressing the propriety of campaign contributions, which the instant case clearly is, is McCormick v. United States, 500 U.S. 257 (1991).  The Supreme Court unanimously held that the existence of a "quid pro quo" is necessary to convict a public official of Hobbs Act extortion "under color of right" based on campaign contributions.  The majority of the Court held there must be an "explicit promise or undertaking by the official to perform or not perform an official act."  The Court was clearly mindful of the reality of the political system:

> to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress would have meant by making it a crime to obtain property from another with his consent, 'under color of official right.'

The Court in *McCormick* affirmed the formulation applied by the Fifth Circuit in *United States v. Dozier*.

- 23 -

> Whether described familiarly as a payoff or with the Latinate precision of a quid pro quo, the prohibited exchange is the same: a pubic official may not <u>demand</u> payment as inducement for the promise to perform (or not to perform) an official act.

Campaign contributions to a public official can implicate 18 U.S.C. §§1346 and 1343 involving honest services fraud bribery and mail fraud in connection with bribery.  Every court who has addressed the issue regarding the necessity of quid pro quo, including the Third Circuit, has ruled that these statutes require proof of a <u>specific</u> quid pro quo.  <u>United States v. Chaitock</u>, 2008 WL 2569343 (3rd Cir. 2008) and <u>United States v. Kemp</u>, WL 2410132 (3rd Cir 2007) concluded that bribery requires a specific intent to give or receive something of value in exchange for an official act.  The Third Circuit in <u>United States v. Wright</u>, 13-1766 (3rd Cir. 2015), the Court further spoke on the Government's burden in an honest services bribery case:

> An honest services fraud prosecution for bribery after *Skilling* thus requires the factfinder to determine two things.  <u>First</u>, it must conclude that the payor provided a benefit to a public official intending that the will thereby take favorable official acts that he would not otherwise take.  <u>Second</u>, it must conclude that the official accepted those benefits with the intent to take official acts to benefit the payor.  The intent of both parties may be inferred from circumstantial evidence.  "The quid pro quo can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity 'under color of official right.'"

The Court's language requiring that the public official take favorable action"***that he would not otherwise take***" places a more onerous burden on the Government than prior cases that stated that the Government needed only to demonstrate that the public official took an official action favorable to the payor.

Circuit courts are split regarding whether 18 U.S.C. §666 requires proof of quid pro quo. The First, Second, Fourth, Fifth and Eight Circuits have held that bribery convictions under Section 666 require a "quid pro quo" agreement.   *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (emphasizing that the "crime of bribery requires a quid pro quo"); *United States v. Griffin*, 154 F.3d 762, 763 (8th Cir. 1998); *United States v. Jennings*, 160 F.3d 1006, 1015-16 & n. 3-4 (4th Cir. 1998); *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993).   The Sixth, Seventh and Eleventh Circuits, however, have held that Section 666 does not require proof of quid pro quo.   *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010); *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009); *United States v. Gee*, 432 F.3d 713, 714-15 (7th Cir. 2005).

The analysis in the instant case must flow from the Supreme Court's rationale and clear distinction in McCormick between campaign contributions and non-campaign contributions. Justice Scalia in McCormick noted this when he wrote the "distinction between lawful campaign contributions and unlawful extortionate activity is an explicit promise of favorable future action." Id. at 278 (Scalia, J., concurring); see also *Luzerne Cnty. Ret. Bd. v. Makowski*, 627 F. Supp. 2d 506, 563 (M.D. Pa. 2007) (reiterating that "[c]ampaigns are expensive, and candidates must constantly solicit funds").   The McCormick analysis was not just focused on the Hobbs Act, but on the unique circumstances of the political process and the First Amendment right to make a campaign contribution.   McCormick's quid pro quo analysis should clearly be the standard in the instant case since the Government's allegations are campaign contributions for contracts.

McDonnell v. United States, 136 S.Ct 2355, 195 L Ed 2d 639 (2016) set a new standard for "official act."   The public official has to do more than set up a meeting, talk to another public

official or organize an event for the payor.  The Court held:

> The "question, matter, cause, suit, proceeding or controversy" must involve *a formal exercise of governmental power* that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  It must also be something *specific and focused* that is "pending" or "may be by law brought" before a public official.  To qualify as an "official act," the public official must *make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so*.

In light of this law an analysis of the specifics of indictment follows:

Counts 6, 38, 39 and 49 - Ramzi Haddad

Count 6 refers to a $2,500 campaign contribution by Mr. Haddad for the Mayor's annual Christmas party.  Mr. Haddad has contributed to this party in years past.  The contribution was on December 14, 2015.  The indictment says this was done for the explicit purpose of expediting a zoning approval.  The Grand Jury, as previously noted, never heard from Mr. Haddad, and never heard one piece of testimony that the $2,500 was given to Mayor's Christmas party for that purpose.  Since this was a campaign contribution, the holding and philosophy of the Supreme Court in McCormick controls.  There is not one scintilla of evidence before this Grand Jury that remotely suggests a quid pro quo arrangement for an expedited zoning review.  In fact nothing with regard to this zoning issue was known to anyone until five days after the Christmas party contribution.  Haddad was not changing the use of Sherman Street, it did not need zoning board approval.  Haddad was simply dividing up existing use and renting them out for the same purpose.  He wanted it done so he could have tenants occupy the premise.  Barbara Nemith, the zoning supervisor, was going on vacation till early January and Haddad needed it done before her return.  The Mayor asked Fran Dougherty to see what he could do - normal constituent services.

Dougherty e-mailed Nemith, who responded that Haddad had not filed the required application. This is the BASIS for Count 38.  Haddad was told of his failure to file an application so he submitted application dated December 18, 2013.  Nemith required site plans before approval. After providing plans as required, Nemith approved zoning application.  The Christmas party contribution was not tied to this normal everyday scenario of city Government.

Under McDonnell, merely seeing if a city official can do their job just a little earlier for convenience of a constituent is hardly "a formal exercise of governmental power".  Mayor Pawlowski never "made a decision, or took an action on the question, matter, cause or suit."  The Mayor had no input at all in the zoning application.  The e-mails presented to Grand Jury clearly show that it was Nemith who properly handled this situation pursuant to her job description.

The Third Circuit in the United States v. Wright, 13-1766 (3rd Cir. 2015) the Court stated: "An honest services fraud prosecution for bribery after *Skilling* thus requires the factfinder to determine two things.  First, it must conclude that the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take. Second, it must conclude that the official accepted those benefits with the intent to take official acts to benefit the payor."

Mayor Pawlowski then would have had to take action favorable to Mr. Haddad that he would not otherwise have taken.  As stated earlier, the Mayor had no input in zoning application and Nemith would have taken the same course of action either December 9, 2014 or January 7, 2015 when she returned from vacation.  This is the exact type of "furthering the interests of some of their constituents" that McCormick and then McDonnell expressly disavowed.

Count 39, involving the same property, is more of the same as above.  Here the Mayor simply was looking to see why Haddad's inspection had not taken place and to facilitate Building and Standards to do their job.  Again, pursuant to McCormick and McDonnell the Mayor had no official action or formal exercise of Government power.  The Mayor had no input at all into the inspection and remedies required by Building and Standards.  In fact, the Government's evidence further reveals in a secretly recorded conversation (MF - 54 May 18, 2015) that Fleck raised the issue of the inspection to the Mayor, just in terms of Ramzi may need more time to fix any issues the inspection reveals, and the Mayor responded that there wasn't much he could do for that situation.

Count 48 (Travel Act Bribery)

"Under 18 P.S. §4701, an individual may be convicted of bribery if he confers upon a public official "any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant."  Absent proof that a political contribution was made "as consideration for" a vote or other official action by the recipient of said contribution, no violation of §4701 would occur.  See *Commonwealth v. Wojdak*, 502 Pa. 359, 466 A.2d 991 (1983) (intent to influence official action necessary element of bribery charge); *Commonwealth v. Cherpes*, 360 Pa. Super. 246, 520 A.2d 439 (1987) (bribery statute prohibits a "clearly defined quid pro quo transaction"); *Commonwealth v. Schauffler*, 397 Pa. Super. 310, 580 A.2d 314 (1990) (evidence must establish that benefit was conferred in exchange for official action).

This charge involves a trip to New York on May 18, 2015 by the Mayor to seek political contributions for his United States Senate race from Mr. Haddad.  Again Mr. Haddad never testified before the Grand Jury to give the grand jurors a first hand account of this meeting.

However, a secret recording was made of their meeting (MF - 55, 5/18/15) and despite it being very difficult to understand, there is absolutely no quid pro quo bribery under 18 Pa. Cons Stat. §470.  There is also no evidence before this Grand Jury that Mayor Pawlowski did anything after that meeting to facilitate any unlawful activity which is required.

Let us not forget in this analysis the Government's shameful hiding from the Grand Jury the secretly recorded conversation of the Mayor, and attached as Exhibit B, that which directly speaks to the mens rea and intent the Mayor had in dealing with Haddad, i.e., won't cross line with Haddad, will tell Haddad no if he asks to cross the line, we should never come close to crossing the line and we should always act ethically.

Counts, 2, 3, 4, 5, 20, 21, 22, 29 and 30 all deal with the awarding of the tax collection contract of Allentown to Northeast Revenue.  Portnoff Associates had the contract for a number of years.  Portnoff was told that their contract was to be terminated at the end of 2013 and the tax collection was going to be bid out by way of an RFP (request for proposal).  This RFP went out November 13, 2013.  Mind you, this process, RFP, was not required by Allentown because this was considered a legal services contract and could have been awarded just by the Mayor in conjunction with the city solicitor.  The RFP process was compromised by a changing of ratings scores by Dale Wiles and Gary Strathearns on their belief that the Mayor preferred Northeast Revenue.  The evidence presented to the Grand Jury does not reflect any knowledge by the Mayor of this process.

Interesting again because of a clear pattern, John Rogers, the head of Northeast Revenue, was never called before the Grand Jury for his first person narrative about his obtaining this contract from Allentown.  Again, after a review of the FBI interviews of Mr. Rogers, it is

apparent why he was not presented.  There is not a hint of corruption, illegality, quid pro quo, bribery in any way, shape or form in Government interviews.

Counts 2 and 3 involve the Mayor's interaction with Michelle Portnoff in the awarding of this contract.  The explicit quid pro quo required for both of these counts is clearly absent in the Government's Grand Jury presentation.  Michelle Portnoff testified before the Grand Jury on November 1, 2016.  On December 10, 2013 the Mayor solicited a campaign contribution in his bid for governor from Ms. Portnoff.  It should be noted here that this was not unusual in that Ms. Portnoff was solicited and did in fact donate to the Mayor in July of 2011 ($2,500), February of 2011 ($500), August of 2012 ($2,500) and July of 2013 ($2,500).  When requested this time Ms. Portnoff testified at the Grand Jury that she declined to contribute due to the pending of the RFP. The Mayor did not push, pressure or say another thing about this decision.

G.J. Testimony on November 1, 2016 as follows:

> Q.     You said he asked for a contribution in this case.  Is that right?
>
> A.     Yes, he did.
>
> Q.     A contribution for what?  Did he say?
>
> A.     His political campaign.
>
> Q.     What, if anything, did you say at that point?
>
> A.     I said I thought it was inappropriate given the pendency of the proposal.
>
> Q.     Did he respond or ask for an explanation or anything along those lines?
>
> A.     No, he did not.

This is hardly the bribery, quid pro quo and corruption that the Supreme Court contemplated in <u>McCormick</u> or the Third Circuit contemplated in <u>Wright</u>.

<u>Counts 20 and 21</u> allege mail fraud in connection with rejecting Portnoff's RFP.  There is absolutely no evidence before this Grand Jury that indicates Mayor Pawlowski was part of any fraud, rigged the contract or had knowledge that it was being done.  Michelle Portnoff could not have been clearer - Mayor Pawlowski asked for contribution, as he had done many times before, and when Ms. Portnoff declined, that ended it.  Absent evidence of fraud before the Grand Jury, <u>Counts 22, 29 and 30</u> are not viable as a matter of law.

<u>Counts 4 and 5</u> are alleged bribes by Sean Kilkenny to Mayor Pawlowski.  Quid pro quo or any kind of linking campaign contributions to the contract is clearly necessary based on all the previously discussed cases.  Sean Kilkenny has not been charged with making any bribe despite his assisting contributions being directed to the Mayor's campaign for governor.  If not a bribe to give, it's certainly not a bribe to accept.  Sean Kilkenny testified before the Grand Jury on March 28, 2017.  He testified regarding Count 4 and the $2,500 contribution from the Liberty Fund PAC to Pawlowski for Governor on December 18, 2013.  Grand Jury testimony (pg 10 lines 3 - 25 and pg. 11 lines 1 - 15):

> Q.    And while that request for proposal was still open and the city hadn't come back and said who was going to do this contract, did you receive a phone call from Mayor Pawlowski?
>
> A.    I did.
>
> Q.    Was that on or around December the 18th of 2013?
>
> A.    It was.

Q.      And on that date were you at least originally scheduled to go to a fundraiser for
        Mayor Pawlowski?

A.      I was.

Q.      Were you able to go to it?

A.      I did not go.

Q.      What happened after you did not attend?

A.      I did not attend, but I requested from my firm's Political Action Committee a
        check and I sent it to Mayor Pawlowski.

Q.      And why did you do that?

A.      Because he requested it and that the contract was pending at the time and I didn't
        feel I could say no.

Q.      How did he request it?  You didn't see him at the fundraiser; is that right?

A.      No, I believe he called me.

Q.      A telephone call?

A.      A telephone call followed by usually an email solicitation by Mr. Ruchlewicz.

Q.      And you said $2500 was submitted by the firm?

A.      I believe, yes.

Q.      Why did you think you couldn't say no?  Maybe you already answered that, but
        why not?

A.      The contract was - - I mean the RFQ was pending at the time.  He was calling for
        a donation.  I felt like if I didn't give the donation perhaps I wouldn't have as
        good a chance of getting the contract.


        The testimony as to this count reveals no linking of contracts to contributions, no quid pro

quo, no bribery or anything improper at all.  Mr. Kilkenny subjectively felt it important to

contribute but the Mayor never did or said a thing that even remotely resembles bribery.  It is the same subjective feeling Mr. Kilkenny had when he hired Mike Fleck to be a "presence" in Allentown.

Portnoff was solicited with no strings attached, Kilkenny was solicited with no strings attached, Mr. Rogers never testified and there is no evidence before the Grand Jury that the Mayor had any knowledge or participated in any way in compromising the RFP process.  Also, in secretly recorded conversations (MF 102 July 15, 2015) the Mayor, while talking with Fleck and Dougherty, reiterated what the evidence shows, that the Northeast Revenue process was a competitive process without any illegality.

Counts 15, 16, 34, 35 36, 37, 40 - 43 and 44, 45 all deal with the awarding of the Allentown street light replacement contract to The Efficiency Network (TEN).  Patrick Regan is the head of TEN and, as the pattern of keeping first hand knowledge from the Grand Jury continues, Mr. Regan was never presented to the Grand Jury despite a cooperation plea agreement.

The fundamental flaw in all of these counts as it relates to the TEN lighting contract is that Mayor Pawlowski had no input to the lighting contract process and did not in fact make the decision to eventually award it to TEN.  The awarding of this contract was done by way of an RFP process.  Craig Messinger, Allentown Public Works Director, testified to the Grand Jury on October 4, 2016.  There was an evaluation committee that consisted of Mr. Messinger, Nelson Varghese, Mark Geotsis and Jennifer McKenna.  Six companies applied and were fairly evaluated.  Two companies were the finalists after evaluation and RFP process, TEN and Johnson.  Johnson eventually dropped out, leaving TEN the award winner.  Mr. Messinger

testified at the Grand Jury that TEN was "very qualified" to do the job.  Mr. Messinger testified

that the Mayor or the managing director Fran Dougherty did not have any input in this decision.

Mr. Messinger did testify that he believed TEN was the preferred company by the

"Administration" but was never told by anyone that TEN should get the contract (G.J. 10/4/16,

pg. 15, 16).

> Q.     Again, I don't want to put words in your mouth, but you've indicated that based
> on these meetings it was relatively clear to you that the import was that The
> Efficiency Network should get this contract.  Is that right?
>
> A.     Right.  It was never told to me that they were, but I can make that assumption.

There was nothing improper in the RFP evaluation process.  The RFQ was first published

February 27, 2015 with award being given to TEN on June 19, 2015.

The Government in connection with their attempt to "fairly" investigate this matter never

presented to the Grand Jury a secretly recorded conversation (MF 78) in which the Mayor

explicitly says there was nothing improper with TEN contract and that he had nothing to do with

this contract or picking contractors.  Alleged pay to play but the Mayor, from his own words, had

nothing to do with getting this contract to TEN.  In another secretly recorded conversation

withheld from the Grand Jury (MF 102 July 2, 2015), the Mayor indicates that TEN went through

a legitimate and competitive RFP process.  The Mayor reiterated that his only involvement at all

in the contract process was the formality of signing the contract.  Even Fran Dougherty chimed

into this conversation that everything regarding this TEN contract was above board and nothing

was rigged.

Count 15 deals with the Mayor soliciting a bribe from Patrick Regan on March 10, 2015

by requesting a contribution to the Municipal League (a statewide association of mayors).  This

was not even a contribution to any campaign of the Mayor.  The Grand Jury heard no evidence

from Mr. Regan or any other source that put any strings to this contribution or any quid pro quo

or any linkage to specific official acts.  The following is a transcript of that request recorded

secretly on March 10, 2015:

> EP:    [place phone call to Patrick Regan] Hey Pat, Ed Pawlowski...I'm doing well...Hey Pat, I don't know if I talked to you about this before, but the Pennsylvania Municipal League, you know that's, that's all the mayors and council people from all over the state, municipalities.  They're having their statewide conference in Allentown this year, this summer.  And a, I was wondering if you guys would want to be a sponsor.  I think it's a great way to promote, you know, the company to every municipality across the state.  Umm, you know, I wondered if you guys wanted to, wanted to be a sponsorship?...
>
> EP:    I could, I could, I could send you like a whole packet, yup.
>
> EP:    Great, I'll send it over to you a, a, by next (ph).
>
> EP:    Everything's going good man.  Excellent.  How about you?  How are things?  How are things out your way?
>
> EP:    I heard you got a big deal, a big contract at Penn State; that's good.
>
> EP:    Awesome.
>
> EP:    Good. (UI) That's great.
>
> EP:    Yeah, let, let me know what you can do, okay
>
> EP:    Thanks, appreciate it man.  Talk to ya.  Bye bye.  **(10:04:29)**

It is simply beyond all sense of responsibility for the Government to represent this as a criminal

bribery solicitation.  However, it is totally consistent with their entire pre-conceived mind set and

their desperate attempts to put a square peg in a round hole.

Just prior to this solicitation of Mr. Regan, Sam Ruchlewicz is discussing with the Mayor who he should be calling for contributions.  The following is secretly recorded on March 10, 2015:

(SR - 345 3/10/15)

EP:   I don't know what they do, man, I have no clue.  What's TEN?  Who's TEN again?

SR:   That's a <u>Patrick Regan and Troy Geanopoulus</u>.  That's a really good one. You should hit them for a lot.  Especially since they came up light in their check.

EP:   Did they?

SR:   Yeah.

EP:   How light?

SR:   A thousand.

EP:   Maybe they're having a tough time?

SR:   They just got five million venture money.  I think they're okay.

EP:   Oh, okay.

SR:   Also they got a forty million dollar project from Penn State.  I think they're okay.

Mayor Pawlowski is alleged to be involved in a pay to play scenario with Mr. Regan and TEN and yet he isn't even sure who they are and makes no mention of any potential lighting contract.  In fact there is a secretly recorded conversation with the Mayor and Mr. Regan of January 28, 2015 (SR 294) where this contract is discussed but absolutely no mention of any quid pro quo or contracts for campaign contributions.  The Mayor discusses a bond deal that is needed

to fund the effort and requests Mr. Regan to send him the "performance contracting language" that Mr. Messinger and Mr. Varghese seemed to like in connection with this contract.

<u>Count 16</u> involves the bribery effort of the Mayor from May 5, 2015 to June 29, 2015 of Jim Hickey in connection with this TEN lighting contract.  The fact that the Government can even suggest pay to play with Mr. Hickey is simply disingenuous.  Mr. Hickey is on many secretly recorded tapes complaining that Allentown does not engage in pay to play and he gets nothing out of Allentown.  Excerpts from secretly recorded conversation on May 6, 2015 with Sam

    (SR 392)

        SR:    And the, oh, and Ed wants you to max too.

        JH:    That's not happening.

        SR:    Alright.

        JH:    I'm not giving twenty grand to Ed Pawlowski.

        SR:    No, not, no, no, no, not twenty.  Five thousand, four hundred.

        JH:    <u>For what?  I mean, seriously.  How well have I done in Allentown</u>?  I have-

        SR:    Boyle.

        JH:    I have gotten, for my clients, I'll, I'll give Ed money.  And I'll give him a good amount of money this year.

        SR:    Alright.

        JH:    But I have gotten a (ui) out of Allentown compared to a, everyone else in the Lehigh Valley.  Seriously.

        SR:    I know, so what do you-

JH:     They are my lowest performing municipality-

SR:     Outside of Whitehall.

JH:     In this county...09:26:13

09:30:00

SR:     I mean other than Boyle, who your, Boyle's doing great in Allentown.

JH:     And, and who set that up?  Who laid out the framework for that to Ed, on how to a, set up his own system to raise money?  That was me.  <u>Because all of my people, all of my people had been boned in Allentown.  No one had gotten dick.  So I told, and, and he came to me with Mike</u>-

SR:     Hmm, mmh-

JH:     And said, well you know, Sean Boyle gave John Callahan twenty thousand dollars last year.  I said, yeah.  You know why he did?  Cause in the last three years, he's gotten over two million dollars in fee.  Not project, fee work, out of the city of Bethlehem.  And this is how Sean does it.  And I explained the whole a, paradigm of having your CM control the vendor chain-

SR:     Right.

JH:     So everyone in the vendor chain is friendly.  Because Ed was too incompetent to do that on his own.  You know what I mean?

SR:     Hmm, mmh.

JH:     So I mean it's a, your public works, your public works is still the fucking holy grail.  None of my people have <u>ever</u> gotten dick out of there.

What can be clearer than this conversation?  Allentown and Mayor Pawlowski don't play the pay to play game like other municipalities.  The Government should try to understand that when you "pay" the result is not getting "boned" or " not getting dick" from the city of Allentown.

<u>Counts 27, 28, 34 - 37, 40 - 45</u> all deal with e-mails sent in connection with this concocted pay to play scenario.  As should be plain to see by anybody from the previous

- 38 -

discussion that this theory is simply a Government fantasy.

Counts 8, 26, 32 and 33 deal with the awarding of a swimming pool repair contract to the firm of Spillman Farmer.  Pay to play in connection with this contract per the Grand Jury evidence is simply absurd.  Joseph Biondo is the head of Spillman Farmer.  He testified before the Grand Jury on June 6, 2017.  As has been the case throughout this Grand Jury investigation, when first person testimony is presented the truth is better served.  Mr. Biondo testified to the following:

- - -   "As an office we don't pay to play" (G.J. Pg. 13 lines 19 - 20)

- - -   "We're an open, honest highroad type of firm, and we don't cross the line."  (G.J. Pg. 14 lines 12 - 14)

Reaction to June 24, 2015 request for a $2,700 campaign contribution

- - -   "We kind of chuckled a bit, because that is something we don't do, and it never went any further than that" (G.J. Pg. 23 lines 17 - 19)

- - -   "I didn't feel pressured.  It seemed professional" (G.J. Pg. 26 lines 10 and 11)

- - -   "His demeanor and tone seemed professional to me."  (G.J. Pg. 28 lines 18, 19)

The letter awarding the contract went out to Spillman Farmer on April 9, 2015.  (Count 26).  The first solicitation for campaign contributions were two and half months after the awarding of the contract.  Counts 32 and 33 deal with invitations to other companies to look at pools for purpose of bidding on repair.  The contract awarded to Spillman Farmer was not at all influenced by the Mayor, he had no input in the selection and requested a contribution after the award.  Pay to play must have a different meaning to the Government.  In fact, in a secretly recorded conversation (MF 99 July 1, 2015), which of course the Grand Jury never heard, Fleck brings up the failure of

Joe Biondo to contribute and the Mayor had no idea who that was or any knowledge of any connection to Spillman-Farmer or any contract.

Counts 9, 10, 23, 24 and 25 deal with the awarding of a contract to McTish-Kunkel for engineering work for the Basin Street project. Matt McTish was a regular and consistent donor to Mayor Pawlowski. Matt McTish contributed twice in 2011 ($3,750) twice in 2012 ($3,750), and once in 2013 ($1,000), once in 2014 ($1,125) and once in 2015 ($2,500). The RFP for the Basin Street project was put out on December 13, 2013 and was awarded to McTish a few months later on April 2, 2014 after McTish submitted an RFP on January 16, 2014.

Count 9 claims that a contribution in October of 2013 was done as quid pro quo or linked to the awarding of the Basin Street project. The Basin Street project announcement and RFP was not until two months after the contribution that the Government is saying was intended at the time to influence an RFP that didn't even exist yet. The pay to play meaning for the Government, that was talked about earlier, now has the added component to the definition - clairvoyance.

After Mr. McTish submitted his RFP in January of 2014, it wasn't till eleven months later and eight months after the contract award that he again contributed to the Mayor, December 19, 2014, which was a regular and consistent payment for the Mayor's annual Christmas party.

Mr. McTish testified before the Grand Jury on May 24, 2016. It is these rare first person presentations to the Grand Jury that are more reflective of true facts and the true narrative. Mr. McTish in his Grand Jury testimony reiterated the refrain we discussed earlier with Jim Hickey, i.e., Allentown and Mayor Pawlowski don't play ball, don't give out contracts for contributions and don't engage in pay to play.

Grand Jury testimony of Mr. McTish:

Q.      I want to turn back to the same time frame beginning in <u>2011</u>, <u>2012</u> and <u>2013</u>. Over that period of time you were giving, is it fair to say, thousands of dollars in campaign contributions to Mayor Ed Pawlowski as well as State Representative Pete Schweyer?

A.      Yes.

Q.      And <u>you were doing</u> that in the hopes of getting some benefit in terms of city contracts?

A.      Yes.

Q.      And there came a point in time where you had been giving thousands and thousands of dollars and **<u>not getting any reward</u>** from your perspective which was beginning to make you frustrated.  Correct?

A.      Yes.

Q.      In fact, you expressed your frustration about that fact in an e-mail on <u>August 25, 2013</u> to a person named Jen Mann.  Right?

A.      Yes.

Q.      Who is Jen Mann?

A.      Jen Mann at that time was a Business Development Consultant for our firm.

Q.      For?

A.      For McTish, Kunkel & Associates.

Q.      She was helping you get more business?

A.      Yes.

This frustration of not getting any "reward" from Allentown or the Mayor continued into 2015. Grand Jury testimony of Mr. McTish:

Q.      Did you, in fact, continue to give contributions in the following months after that?

A.      Yes.

- 41 -

Q.      In February of 2015, specifically February 20, 2015, Jen Mann forwarded you an
        e-mail from Fran Dougherty and the City of Allentown indicating that they were
        going to have the Chew Street project done inhouse; in other words, they weren't
        going to have an outside engineering firm do the work.  Is that correct?

A.      That's correct.

Q.      Is it fair to say that made you unhappy?

A.      Yes.

A secretly recorded breakfast meeting with Sam, McTish and the Mayor on April 27,
2015 reveals the Mayor asking for a contribution prior to June 30th filing deadline and if there is
some help McTish could provide in Pittsburgh area.  There is no pay to play, no contracts for
contributions or anything illegal being discussed.

The Mayor asked for a bundled contribution of $21,600.  Mr. McTish made a
contribution substantially less than requested and held out giving him the check till July 1st
because he was upset because he was being asked for so much money and not getting any real
reward.  Mr. McTish testified:

Q.      What is it?

A.      It's the campaign contribution I made to Pawlowski 2016 for $2,500.

Q.      What's the date on that?

A.      June 30, 2015.

Q.      You heard in the phone call that he said that he needed the money by June 30th.
        Correct?

A.      Yes.

Q.      Did you actually give him this check on June 30th?

- 42 -

A.      No.

Q.      When did you give him the check?

A.      July 1st.

Q.      Why did you wait until July 1st?

A.      I wanted to send a message that I was upset with him trying to ask for so much money by that particular deadline.

Q.      Were you also upset because you were getting mixed messages about this Chew Street project?

A.      Yes.

In conclusion, there is not one piece of evidence this Grand Jury heard, either through McTish, recordings or documents that supports the "explicit" agreement alleged by the Government.  Just because the Government says that in their questioning and their indictment doesn't make it fact unless there is evidence before the Grand Jury to support it.  Mr. McTish's own plea agreement discusses his subjective "belief" that giving a contribution would give his company a "competitive edge."  This is hardly the quid pro quo required in a campaign contribution case.

Counts 18, 46 and 47 deal with a cyber-security contract awarded to a company called 5C Security.  Jack Rosen was the contact person for this contract.  Again Jack Rosen was never presented to the Grand Jury for first hand testimony regarding the circumstances of the contract and his campaign contributions.  Even more shocking, he's never been interviewed by the Government.  Mayor Pawlowski then is indicted for soliciting a bribe from someone the Grand Jury never heard from or the Government never interviewed.  There again is not one piece of

- 43 -

evidence that this Grand Jury heard to substantiate the link between the Mayor's request for contributions and the cyber-security contract.

Counts 46 and 47 allege Travel Act Bribery for two meetings between the Mayor and Jack Rosen in New York.  A necessary element of these counts is that the Mayor engaged in state bribery as defined in 18 Pa. Cons Stat. §4701.  Under 18 P.S. §4701, an individual may be convicted of bribery if he confers upon a public official "any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise or discretion as a public servant."  Absent proof that a political contribution was made "as consideration for" a vote or other official action by the receipt of said contribution, no violation of §4701 would occur.  See Commonwealth v. Wojdak, 502 Pa. 359, 466 A.2d 991 (1983) (intent to influence official action necessary element of bribery charge); Commonwealth v. Cherpes, 360 Pa. Super. 246, 520 A.2d 439 (1987) (bribery statute prohibits a "clearly defined quid pro quo transaction"); Commonwealth v. Schauffler, 397 Pa. Super. 310, 580 A.2d 314 (1990) (evidence must establish that benefit was conferred in exchange for official action).  This May 18, 2015 meeting was secretly recorded by Mike Fleck (MF - 55, 5/18/15).  A review of this tape shows "no clearly defined quid pro quo" as require by Pennsylvania state law.  There is general talk about possible development projects in Allentown, since Rosen is a developer, and a brief explanation of what 5C was going to do, but the bulk of the conversation was simply a political discussion of what was needed for a successful Senate race, the money needed and the potential for success.  The Government trying to characterize this as a bribe solicitation is simply false and is consistent with their repetitive false narratives and misrepresentation of plain facts to fit their agenda.

Count 17 deals with a solicitation to bribe Scott Allinson and the law firm of Norris McGlaughlin.  Mayor Pawlowski on May 20, 2015 scheduled a meeting with Matt Sorrentino and Scott Allinson of the law firm Norris McGlaughlin.  The purpose of this meeting by the Mayor was to make a pitch about his chances and what he needs to win the Senate primary and Senate election.

There are two secret recordings on this day that clearly and unequivocally show the nature of the interaction between the Mayor and Norris McGlaughlin.  The first, previously referenced in this Motion, is before the Norris McGlaughlin meeting.  This is between Fleck and the Mayor to prepare for the law firm meeting (MF - 58 (2&3), 5/20/15).  When it is suggested that work for law firm be discussed, the Mayor expresses his concern with this by saying "doesn't that cross the line."  Hardly the comment of an individual preparing to solicit a bribe.

The second, also previously mentioned in this Motion, is a secret tape recording of this actual meeting with the law firm (MF 58, 3&4, 5/20/15).  (Attached Exhibit G).  I urge this Court to listen to this recording.  Characterizing this conversation as a bribe solicitation is, at best, disingenuous but in reality simply false.  This conversation is nothing but the Mayor making his pitch as to why he can win the Senate race and a myriad of other political musings.  Matt Sorrentino tells the Mayor they will help him because "he has earned it" and has "done a good job" and has a "good story to tell" not for any specific contract or official act.  The Government is simply making up scenarios that the uncontroverted facts before the Grand Jury do not support.

Count 7 deals with alleged solicitation of a bribe from Mark Feller of the Dilworth law firm on June 15, 2015.  This meeting was also secretly recorded by Mike Fleck (MF 86 - 04, 6/15/15).  (Attached Exhibit H)  Again, I urge the Court to listen to this recording.  Nothing even

resembling a bribe is heard in this recording.  It is the same old campaign pitch by the Mayor, what he has done in Allentown, how he can beat Sestak and how vulnerable Senator Toomey is. The Mayor talks of wanting to make a difference and Mr. Feller's response is that they will try to help his effort.  The Mayor asked for $20,000 in help but Mr. Feller was only able to muster $5,000 with no strings attached, no linkage to legal work and no quid pro quo or bribery.

Counts 11 - 14 involved alleged Hobbs Act extortion and solicitation to bribe the law firm of Stevens and Lee through conversations with Jonathan Saidel and Don Weiand.  Mr. Weiand being a member of the firm and Mr. Saidel being "of counsel" to the firm for purpose of developing business using his political connections.

Counts 11 and 12 deal primarily with Mayor Pawlowski's interaction with the aforementioned Jonathan Saidel on March 12, 2015.  This meeting, thankfully for the Mayor, was secretly recorded (SR 347, 24, 5, 6; 3/12/15).  (Attached Exhibit I)  Again, the recording does not even come close to a bribe or the specific quid pro quo that is required under McCormick.  Mr. Saidel was attempting to smooth over the anger the Mayor had due to the fact that Stevens and Lee had been the source for a newspaper article trashing the Mayor over his city water deal.  After that part of the conversation, it quickly goes into long drawn out political discussion regarding the Mayor's viability as a Senate candidate, his plans to run, his need to get a meeting with Congressman Bob Brady.  Saidel tells the Mayor, if Stevens and Lee does get any future legal work, it has to come through Saidel so he can get credit within the firm for the business.  Mr. Saidel, after this political discussion, tells the Mayor he has his support.  There is not a single mention of contracts or legal work as a quid pro quo for contributions as is required under McCormick.  It simply is incredible, when we have the actual recording, that the

Government can try to call this Hobbs Act, and quid pro quo extortion and bribery.  The Government is trying to sell it is raining outside when we all can see the sky is blue.

Counts 13 and 14 relate to a phone call from the Mayor to a member of the Stevens and Lee law firm.  This phone call was June 8, 2015 during the period of time the Mayor was seeking contributions to show he was a viable candidate for the Senate.  Don Weiand, of Stevens and Lee, received a call from the Mayor on June 8, 2015.  Grand Jury transcript of that conversation is as follows:

> Q.    What, if anything, did he say to you?
>
> A.    After we got through this how are you doing, the first thing that he said to me was "you're going to get a call from Susan Wild."
>
> Q.    Susan Wild again being the Solicitor.  Is that right?
>
> A.    That's correct.
>
> Q.    What did that mean to you?
>
> A.    That meant to me that I think the city was going to send me some legal work.
>
> Q.    What else did he say?
>
> A.    He then launched into his sort of campaign pitch of I'm running for senate, I think I have a really good chance of winning, I can win the primary, and somewhat appropriately today he said I'm going - - basically he said he was going to ride Hillary Clinton's coattails to victory.  This is basically what he was saying.
>
> Q.    Did he ask you for anything?
>
> A.    He did.  After he did the pitch about how he was going to win and he thought he could do this he said I would like to - - I'm asking you to contribute a thousand dollars to my campaign.
>
> Q.    Did you agree to do that?
>
> A.    I did.

Q.      Why?

A.      There were a couple of reasons, but the one was - - I mean when somebody pins you down like that, it's kind of hard to say no.  I <u>felt</u> that if I said no, there was no chance I was ever going to get any legal work from the city.  So, it was a combination of I hate to say no to people.  It's hard to say I'm not going to contribute to your campaign, but it's also - - in that instant I knew that if I said no, I wasn't going to get a call from Susan Wild.

Q.      About how long was this whole conversation from start to end?

A.      It was probably like five to eight minutes, something like that.

Q.      How would you describe the way the Mayor was coming across to you?

A.      Well, I had been involved in politics a long time, but he was in fund-raising mode.  There was, sort of, a sense of desperation possibly.  I knew the situation politically.  He needed to raise money to show that he was a viable candidate.  That June 30th deadline was important to him.  So, it was a sense of I really need to get this money.

The <u>McCormick</u> standard for campaign contributions to be illegal, i.e., an "explicit promise or undertaking by the official to perform or not to perform an official act" is clearly not made out by the Weiand Grand Jury testimony.  There simply was no explicit promise for more legal work if you give a $1,000 campaign contribution.  Mr. Weiand had his own subjective "feeling" and difficulty saying no but there was never a word uttered by the Mayor to reflect a specific, explicit promise in return for a contribution.  Transforming the above into a Hobbs Act, bribery charge is just another attempt by the Government, in a constant and familiar litany of attempts, to create a narrative based on their agenda, without the facts and the law to support it.

<u>CONCLUSION</u>

The Government has abused its responsibility to present fair, accurate and complete information to the grand jurors to ensure an informed and independent decision on probable cause.  The Government's manipulation of the evidence, the lack of first hand testimony, false conclusionary questions, misleading Government agents' testimony and withholding extraordinary exculpatory evidence requires this Court to dismiss the indictment due to prosecutorial misconduct, investigative abuses and suppressing evidence that exculpates the Mayor from criminal responsibility.

Further, the specific counts of the indictment as previously discussed are not made out as a matter of law in the indictment.  The Government's complete blind eye to the very specific requirements of the Supreme Court in <u>McCormick</u>, <u>McDonnell</u> and the Third Circuit in <u>Wright</u> demands dismissal of these counts.

The Government, through this indictment and press conference, has posited a systematic pay to play scenario with city hall up for sale to the highest bidder.  The evidence before this Grand Jury and hidden from this Grand Jury make that assertion shameful.  The concept of "trumped up charges" based on all of the above should be obvious - the main informant/witness says the Mayor has <u>never</u> done anything wrong, the Mayor himself is recorded expressing his intent to <u>never</u> cross the line and to always act ethically, the Mayor is recorded explicitly rejecting pay to play offers, multiple contractors have indicated they don't get business for contributions and over a thousand recordings and <u>not</u> <u>one</u> direct pay to play scenario.

- 49 -

**WHEREFORE**, the Defendant, through counsel Jack McMahon, requests dismissal of the Indictment.

Respectfully submitted,


Date: November 1, 2017                    /s/ Jack McMahon_____
                                          Jack McMahon

## CERTIFICATE OF SERVICE

The undersigned hereby certify that on this date a copy of the foregoing Motion to Dismiss Indictment was electronically served, by the Court's electronic case filing system, upon the following:

Anthony Wzorek, AUSA
Michelle Morgan, AUSA
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Date: November 1, 2017                    /s/ Jack McMahon_____
                                          Jack McMahon