# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA            :

         v.                            :         **CRIMINAL NO. 17-390-02**

SCOTT ALLINSON                   :

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT ALLINSON'S MOTIONS

        The United States of America, by its attorneys, Louis D. Lappen, Acting United States Attorney for the Eastern District of Pennsylvania, and Anthony J. Wzorek and Michelle L. Morgan, Assistant United States Attorneys for the District, hereby responds to defendant Allinson's motions to dismiss the indictment and for severance.

## A.     Background

        On July 25, 2017, defendant Scott Allinson was indicted by a federal grand jury in Count One with conspiracy to commit mail fraud, wire fraud, honest services fraud, federal program bribery and Travel Act bribery, in violation of 18 U.S.C. § 371; and in Count 19 with attempted federal program bribery-offering, in violation of 18 U.S.C. § 666(a)(2). The indictment makes clear that defendant Allinson and Edwin Pawlowski agreed to enter into a symbiotic relationship in which Pawlowski would funnel City of Allentown legal work awarded to the Norris McLaughlin law firm through Allinson, an attorney at that firm, so that Allinson would get internal credit from the firm for obtaining that work, and so that Allinson, in turn, would assure that campaign contributions were made from the firm to Pawlowski.

## B.     Defendant's Motion to Dismiss on Due Process Grounds Should be Denied

        Defendant Allinson first files a motion to dismiss the indictment based upon an alleged violation of due process. He claims that no evidence was presented to the grand jury to

support Overt Act 129 of Count One of the indictment,[1] that the statement made in the indictment is contrary to what happened at the May 20, 2015 meeting, and that the grand jury was misinformed about this event. He further alleges that this May 20, 2015 meeting provides the only explicit quid pro quo alleged by the government and the only official act allegedly done by defendant Pawlowski. Finally, he claims that the government failed to present what he characterizes as exculpatory evidence to the grand jury.

The defendant's motion to dismiss the indictment should be denied because there is a robust factual basis to support the corruption charges set forth in the facially sufficient indictment returned by the grand jury against defendant Allinson. Moreover, the grand jury was correctly charged on the issue of intent and its decision to indict the defendant on federal program bribery and conspiracy should not be disturbed by the sort of second-guessing engaged in here by the defendant.

---

[1] Overt Act 129 states that "On or about May 20, 2015, defendant EDWIN PAWLOWSKI met with defendant SCOTT ALLINSON and another member of Law Firm #2 and solicited a contribution of $25,000, and said that the City of Allentown might have more legal contract trust work for Law Firm #2.

Overt Acts 130-132, not cited by the defendant in his motion to dismiss, continue:

130.    On or about May 22, 2015, defendant SCOTT ALLINSON told S.R. that defendant PAWLOWSKI asked for a lot of money when they were getting "absolutely zero back from the City."

131.    In or about the week before June 15, 2015, defendant EDWIN PAWLOWSKI told the Allentown City Solicitor to give legal contract trust work to Law Firm #2.

132.    Between on or about June 18, 2015 and June 26, 2015, defendant EDWIN PAWLOWSKI and defendant SCOT ALLINSON cause Law Firm #2 to contribute $20,000 to Pawlowski 2016.

1.       **The grand jury returned a facially valid indictment**.

The defendant's claim is nothing more than a dressed-up attack on the sufficiency of the evidence presented to the grand jury, the type of claim that the Third Circuit disfavors. At this pretrial stage of the proceedings, the Court's review should be restricted to the facial validity of the indictment and its inquiry into the underlying factual basis of the indictment should be constrained by the applicable jurisprudence. The indictment satisfies such an inquiry.

"It is well-established that '[a]n indictment returned by a legally constituted and unbiased grand jury, ... *if valid on its face,* is enough to call for trial of the charge on the merits.' United States v. Vitillo, 490 F.3d 314, 320 (3d Cir.2007) (quoting Costello v. United States, 350 U.S. 359, 363 (1956)). An indictment is facially sufficient if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." Id. at 321 (citation omitted). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation" to permit a defendant to prepare his defense and invoke double jeopardy. United States v. Kemp, 500 F.3d 257, 280 (3d Cir.2007) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir.1989)). Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred. United States v. Urban, 404 F.3d 754, 771 (3d Cir.2005). In contrast, if an indictment fails to charge an essential element of the crime, it fails to state an offense. United States v. Wander, 601 F.2d 1251, 1259 (3d Cir.1979).

In determining whether an indictment validly states the elements of the offense, we need not blindly accept a recitation in general terms of the elements of the offense. United States v. Panarella, 277 F.3d 678, 685 (3d Cir.2002). "Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings to ... ensur[e] that legally deficient charges do not go to a jury." United States v. Bergrin, 650 F.3d 257, 268 (3d Cir.2011). Although the Government is not required to set forth its entire case in the indictment, "if the specific facts" that are alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," the indictment fails to state an offense. Panarella, 277 F.3d at 685; see United States v. Schiff, 602 F.3d 152, 162–66 (3d Cir.2010) (finding that indictment alleging "failure to rectify misstatements of others" did not, as a matter of statutory interpretation, state an offense under 15 U.S.C. § 78j(b) and SEC Rule 10b–5). However, the scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." United States v. DeLaurentis, 230 F.3d 659, 660 (3d Cir.2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." Id. at 661. There is no criminal corollary to the civil summary judgment mechanism. Id. In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. United States v. Sampson, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir.1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." Bergrin, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether,

assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. <u>Panarella</u>, 277 F.3d at 685; <u>DeLaurentis</u>, 230 F.3d at 660.

For Scott Allinson, the four corners of the indictment include:

a.  Defendant SCOTT ALLINSON was an attorney at Law Firm #2 in Allentown, Pennsylvania and practiced in economic development law, business law, and construction law. Defendant ALLINSON caused and attempted to cause others at Law Firm #2 to make a stream of campaign contributions to defendant EDWIN PAWLOWSKI. <u>See</u> ¶ 17 at page 5 of Indictment.

b.  From at least February 2012 until on or about July 2, 2015, in Allentown, in the Eastern District of Pennsylvania, and elsewhere, defendants EDWIN PAWLOWSKI, SCOTT ALLINSON, and JAMES HICKEY, together with Francis Dougherty, Michael Fleck, Ramzi Haddad, Matthew McTish, Patrick Regan, Garret Strathearn, and Dale Wiles, all charged elsewhere, and S.R., and others known to the grand jury, conspired and agreed to commit mail fraud, wire fraud, honest services fraud, federal program bribery-soliciting, federal program bribery-offering, and Travel Act bribery in violation of federal criminal law. <u>See</u> ¶ 31 at 7.

c.  Knowing that he required substantial amounts of money to finance his statewide campaigns for Governor of Pennsylvania in 2013, and for the United States Senate in 2015, defendant and co-conspirator EDWIN PAWLOWSKI personally solicited, and used campaign operatives Michael Fleck and S.R. to solicit vendors and consultants for vendors, who were doing business with the City of Allentown, or hoping to do business with the City of Allentown, for campaign contributions; communicated to vendors, using Michael Fleck and S.R., who were working both for defendant

PAWLOWSKI and prospective vendors, that the vendors were expected to provide campaign contributions for past and prospective official action by defendant PAWLOWSKI and contracts with the City of Allentown; and held regularly scheduled fundraisers to which it was expected that vendors would contribute for the benefit of defendant PAWLOWSKI's campaigns.

                d.      To obtain contracts with the City of Allentown, defendants SCOTT ALLINSON and JAMES HICKEY, and Ramzi Haddad, Matthew McTish, and Patrick Regan, charged elsewhere, and others known to the grand jury, made campaign contributions and caused others to make campaign contributions, to defendant EDWIN PAWLOWSKI's campaigns for mayor, governor and senator, in return for which they received, and anticipated receiving, favorable treatment from defendant PAWLOWSKI in obtaining contracts with the City of Allentown. See ¶ 33 at 10.

                e.      In furtherance of this conspiracy, defendants EDWIN PAWLOWSKI, SCOTT ALLINSON, and JAMES HICKEY, and Francis Dougherty, Michael Fleck, Ramzi Haddad, Matthew McTish, Patrick Regan, Garret Strathearn, and Dale Wiles, all charged elsewhere, and S.R., and others known to the grand jury, committed the following overt acts, among others:

                113.      On or about February 22, 2012, defendant SCOTT ALLINSON contributed $500 to the Friends of Ed Pawlowski.

                114.      On or about August 27, 2012, defendant SCOTT ALLINSON contributed $250 to the Friends of Ed Pawlowski.

                115.      On or about January 23, 2013, defendant SCOTT ALLINSON contributed $500 to the Friends of Ed Pawlowski.

116.     On or about October 2, 2013, defendant SCOTT ALLINSON, contributed $100 to the Friends of Ed Pawlowski.

117.     On or about December 10, 2014, defendant SCOTT ALLINSON told S.R., a consultant to defendant EDWIN PAWLOWSKI, that he was not in a position to ask attorneys in his firm for political contributions for defendant PAWLOWSKI when they were getting little work for the City of Allentown. He said " . . . but the well is completely dry right now and so I'm just talking our dialect of English that, you know, we've been unbelievably supportive in the past and now, you know, the work's going everywhere but, but to our shop  . . . This is a short term fixable issue."

118.     On or about December 12, 2014, defendant SCOTT ALLINSON discussed with S.R. that the new solicitor for the Allentown Parking Authority would be R.S. from Law Firm #2 and that defendant ALLINSON would get the credit with Law Firm #2.

119.     On or about December 12, 2014, defendant SCOTT ALLINSON agreed to be a $2,500 sponsor for defendant EDWIN PAWLOWSKI's holiday party.

120.     On or about January 23, 2015, S.R. and defendant SCOTT ALLINSON discussed that defendant EDWIN PAWLOWSKI said that he would continue to give lots of work to defendant ALLINSON but that he needed defendant ALLINSON to be a fundraiser for him.

121.     On or about January 28, 2015, defendant SCOTT ALLINSON told Michael Fleck and S.R., consultants for defendant EDWIN PAWLOWSKI, that the

request for $12,500 for defendant PAWLOWSKI "is a heavy stretch unless that is the mayor's way of finding a good spot for us."

122. On or about January 30, 2015, upon hearing of defendant SCOTT ALLINSON's concerns that his campaign contributions had not resulted in sufficient legal work for Law Form #2, defendant EDWIN PAWLOWSKI called Francis Dougherty to find out how much money the City of Allentown paid to Law Firm #2 since 2006.

123. On or about January 30, 2015, Michael Fleck told defendant PAWLOWSKI that, in relation to political contributions, he was going to "beat the shit" out of defendant SCOTT ALLINSON, meaning that he was going to put pressure on defendant ALLINSON to make a contribution.

124. On or about February 3, 2015, defendant SCOTT ALLINSON asked for all City of Allentown work to be funneled through him for Law Firm #2. Defendant ALLINSON told Michael Fleck and S.R. that "If I get a hundred percent of the kind of credit that turns into money, that goes out of my checkbook where you want it to go. So if it comes to me and I get billing credit, then I get the full stack of cash on the one side to do with it what I need to do, annually. Do you know what I'm saying to you? If it goes to anybody other than me, it will get fucked up."

125. On or about February 13, 2015, defendant SCOTT ALLINSON brought a check to the Mardi Gras fundraiser and asked S.R to make sure that defendant EDWIN PAWLOWSKI knew that he had brought a check.

126. On or about February 13, 2015, defendant SCOTT ALLINSON contributed $250 to the Friends of Ed Pawlowski.

127.    On or about March 25, 2015, defendant SCOTT ALLINSON told Michael Fleck that he would tell another partner at Law Firm #2 that defendant EDWIN PAWLOWSKI referred work to many law firms and that if Law Firm #2 was going to handle work they needed to "cobble some money together" for defendant PAWLOWSKI's consultants  because it "isn't like we are being hired because we are good guys. It's not the way this shit works."

128.    On or about April 1, 2015, when S.R. told defendant EDWIN PAWLOWSKI that it was important that defendant SCOTT ALLINSON got the call about work from the City of Allentown so that he could get the credit and so that when we call defendant ALLINSON there is money in "the little fund," defendant PAWLOWSKI said, "I got you."

129.    On or about May 20, 2015, defendant EDWIN PAWLOWSKI met with defendant SCOTT ALLINSON and another member of Law Firm #2 and solicited a contribution of $25,000, and said that the City of Allentown might have more legal contract trust work for Law Firm #2.

130.    On or about May 22, 2015, defendant SCOTT ALLINSON told S.R. that defendant PAWLOWSKI asked for a lot of money when they were getting "absolutely zero back from the City."

131.    In or about the week before June 15, 2015, defendant EDWIN PAWLOWSKI told the Allentown City Solicitor to give legal contract trust work to Law Firm #2.

132.    Between on or about June 18, 2015 and June 26, 2015, defendant EDWIN PAWLOWSKI and defendant SCOTT ALLINSON caused Law Firm

#2 to contribute $20,000 to Pawlowski 2016. All in violation of Title 18, United States Code, Section 371. <u>See</u> pages 24-27 of indictment.

Count 19 of the indictment charges the defendant with federal program bribery-offering and, after incorporating paragraphs 1 to 30, 32 and 33, and overt acts 113 to 132 of Count One, states that from on or about February 2015 through on or about June 30, 2015, in Allentown, in the Eastern District of Pennsylvania, and elsewhere, defendant SCOTT ALLINSON corruptly gave, offered to give, agreed to give, caused, and attempted to cause others to give, something of value, that is, campaign contributions, to defendant EDWIN PAWLOWSKI and his political action committees, while PAWLOWSKI was the Mayor of Allentown and an agent of the City of Allentown, which received benefits in excess of $10,000 in the one-year period from January 1, 2015 to December 31, 2015, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other form of federal assistance, with intent to influence and reward defendant PAWLOWSKI in connection with the business, transaction, and series of transactions of the City of Allentown involving something of value of $5,000 or more, namely, legal services contracts awarded to Law Firm #2, in violation of Title 18, United States Code, Section 666(a)(2).

When examined in view of the applicable law, the indictment withstands proper scrutiny. The indictment certainly is facially valid in that it informs the defendant of statutes he is charged with violating, lists the elements of the offenses, and, as reflected in the paragraphs cited above, provided a fulsome set of allegations with which to prepare his defense.

2. **There is a robust factual basis to support the charges in the indictment**

In order to avoid the Third Circuit jurisprudence as set forth in <u>Huet</u>, <u>Besmajian</u>, <u>Bergrin</u>, and <u>Vitullo</u>, supra, which disavows such an attack on the grand jury's findings, the defendant alleges that no evidence was presented to the grand jury to support Overt Act 129. Contrary to the defendant's claim, the government presented the grand jury with robust evidence to support the charges.

The government presented the following evidence to the grand jury:

a.      a May 12, 2015 intercepted conversation between Sam Ruchlewicz and defendant Allinson in which they discussed the upcoming May 20th meeting with Ed Pawlowski, Allinson, and Matt Sorrentino. During this conversation, Allinson bemoaned the fact that the Norris McLaughlin law firm was getting little work from the City of Allentown and told Ruchlewicz that they would be pretty blunt when Pawlowski met them and discussed his primary election campaign on the 20th.

b.      a May 22, 2015 intercepted conversation between Sam Ruchlewicz and defendant Allinson, in which Allinson references the May 20, 2015 meeting, and told Ruchlewicz that Mike Fleck and Pawlowski sat down with Allinson and Matt Sorrentino the other day and that Pawlowski made a "very large ask" from the Norris McLaughlin law firm for his primary campaign. Allinson said that "$25,000 is a lot of fucking money when you're getting absolutely zero back from the city. I mean, I mean when I tell you bone dry, bone fucking dry." When Ruchlewicz responded that the mayor would change that, Allinson said "So anyway, so anyway, ah think about it."

c.      testimony from Special Agent Scott Curtis, who testified before the grand jury on April 18, 2017, and stated that a week or two after this May 20th meeting,

defendant Pawlowski instructed his City Solicitor to give City of Allentown trust work to the Norris McLaughlin law firm. The City Solicitor sent an email to an attorney at Norris McLaughlin on June 15, 2015 concerning this proposed work. Campaign contributions soon after were made to the Pawlowski campaign by members of Norris McLaughlin on June 18, 2015, June 23, 2015, June 26, 2015, and June 30, 2015, totaling $20,000.

In addition, the grand jury also heard the following intercepted conversations of defendant Allinson:

d.     on January 28, 2015, in which Allinson told Ruchlewicz and Fleck that it would be hard to come up with a $12,500 contribution to Pawlowski unless this was the Mayor's way of finding a good spot for the law firm;

e.     on February 3, 2015, in which Allinson told Fleck that if he got credit for incoming city work, "then I get 100% of the kind of credit that turns money that goes out of my checkbook where you want it to go." In this same conversation, Allinson stated that Matt Sorrentino understood everything and that he and Sorrentino controlled the flow of political donations from Norris McLaughlin. Allinson was told that City of Allentown Managing Director Fran Dougherty had been informed that all Norris McLaughlin work would go through Allinson and he said that he wanted to meet with Dougherty to make sure that everything was pointed in the right direction.

f.     on March 25, 2015, in which Allinson told Fleck that he was going to tell Norris McLaughlin that "You guys got to understand that the Mayor refers work out to like fourteen law firms. Okay, if you guys are going to handle the work and deal with all that stuff, you're gonna have to work with Mike[Fleck} and Sam [Ruchlewicz] on, on put, cobbling

some money together. This isn't like we are being hired because we are good guys. It's not the way this shit works."

Allinson then argues that the government was obliged to present the intercepted conversation of May 20, 2015 to the grand jury because, he claims, that it contradicted the statement that there would be possible additional legal work for Norris McLaughlin as a result of this meeting. The defendant presents the full transcript of the meeting in support of his argument. The transcript shows that the defendant is wrong.[2]

The transcript shows that after Pawlowski asks for $25,000 from the law firm and hears about some potential reluctance on the part of the Republican members of the firm to contribute to him, Pawlowski and Fleck suggest that those members could make contributions to Pawlowski when he was only running against another Democrat candidate in the Democrat primary, and not for the general election against Republican Senator Toomey. Matt Sorrentino of Norris McLaughlin stated that he liked that idea, and said that that was a really good talking point "[f]or us and for our relationship with the city, and you know, from a legal work standpoint." In short, one can easily conclude that Sorrentino, with defendants Allinson and Pawlowski present, was making a connection between contributions to the mayor and continuing legal work to be obtained from the Mayor and the City of Allentown. See pages 21-22 of Defense Transcript.

In fact, near the end of the meeting, after Sorrentino had indicated to Pawlowski that he thought that it was doable that the firm could raise $25,000 for Pawlowski, and after

---

[2] For purposes of this argument, we will use the full transcript of the meeting presented by the defendant. The defendant suggests in his motion that the government's excerpts of transcripts such as this one are somehow less valid that his full transcripts. In reality, what the government has done is to limit the transcripts to the relevant and pertinent parts of the conversations.

being asked by Mike Fleck whether there was any help that Norris McLaughlin needed from the City of Allentown, Sorrentino originally replied no, then almost immediately started asking questions about whether Pawlowski was able to raise money for a project related to one of his clients. Pawlowski went into a rather lengthy explanation about how he had conversations with state authorities about certifying more dollars concerning this project. <u>See</u> pages 27-31 of defense transcript.

Lastly, after leaving the meeting, Pawlowski told Fleck: "But did you like the response to the (UI) thing? You know what that means—it means you guys are gonna be doing more legal work." Through his own words, Pawlowski acknowledges that during the meeting he has made the connection between legal work and the requested $25,000 contribution clear to Sorrentino and Allinson.

Because the transcript did not contradict, but actually supported, the statements in the indictment, there was no prejudice in the May 20, 2015 conversation not being presented to the grand jury, and the defendant's motion should be denied..

All of the above evidence presented before the grand jury supports the indictment and negates the defense argument that no evidence was presented to the grand jury pertaining to this meeting.

   3.      **The grand jury was correctly charged on the issue of intent**

In claiming that the indictment returned by the grand jury is invalid because the government attorneys failed to present sufficient evidence from which the grand jury could properly charge bribery and conspiracy to commit bribery, the defendant ignores the fact that the jury was properly charged on the issue of intent, that is, the nature of the quid pro quo. This charge required the grand jury to evaluate the evidence presented to it in terms of the law.

The instructions here conformed to the cases setting forth the core concepts of intent or quid pro quo for federal bribery offenses.

In <u>United States v. Wright</u>, 665 F.3d 560 (3d Cir. 2010), a post <u>Skilling v. United States</u>, 561 U.S. 350 (2010) case, the Court stated as follows:

> The bribery theory . . . "requires a quid pro quo," <u>United States v. Kemp</u>, 500 F.3d 257, 281 (3d Cir. 2007), that is, "a specific intent to give or receive something of value in exchange for an official act." <u>United States v. Sun–Diamond Growers of Cal.</u>, 526 U.S. 398 (1999) The bribery theory does not require that each quid, or item of value, be linked to a specific quo, or official act. Rather, a bribe may come in the form of a "stream of benefits." <u>United States v. Bryant</u>, 655 F.3d 232, 240–41 (3d Cir. 2011). <u>Id.</u> Intent is the determinant. "The key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action; [indeed,] the government need not prove that each gift was provided with the intent to prompt a specific official act." <u>Kemp</u>, 500 F.3d at 282.

<u>Wright</u>, 665 F.3d at 567-68.

The Court in <u>Wright</u> explained that to convict, the fact-finder must find the following:

> First, it must conclude that the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take. Second, it must conclude that the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor. <u>See</u> <u>Bryant</u>, 655 F.3d at 240–41; <u>Kemp</u>, 500 F.3d at 281–82. The intent of both parties may be inferred from circumstantial evidence. "The quid pro quo can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity 'under color of official right.'" <u>United States v. Antico</u>, 275 F.3d 245, 257 (3d Cir. 2001).

<u>Wright</u>, 665 F.3d at 568.[3]

---

[3]    Furthermore, quid pro quo bribery is not concerned with the wisdom or the result of the official's actions; it is concerned with the manner which the official makes his decision. In <u>United States v. Alfisi</u>, 308 F.3d 144  (2d Cir. 2002), the Second Circuit stated:

Several corollary rules are critical to evaluating the intent of the defendant (payor or public official) and the nature of bribery.

**1.     Agreement need not be express**.  First, the public official need not state the *quid pro quo* in express terms. Evans v. United States, 504 U.S. 255 (1992); Rather, the intent to exchange value for official action may be established by circumstantial evidence based on the defendants' words, conduct, acts, all the surrounding circumstances, and the rational or logical inferences that may be drawn from them. United States v. Wright, 665 F.3d at 568; United States v. Terry, 707 F.3d 612 (6th Cir. 2013).

**2.     Each bribe need not correlate to a specific official act**. Second, although bribery requires the intent to effect an exchange of money or other thing of value for official action, each payment need not be correlated with a specific act. United States v. Wright, 665 F.3d at 568 (citing United States v. Kemp, 500 F.3d 257, 281-86 (3d Cir. 2007) (gift is a bribe when parties understood it was made in return for official action; government need not prove that each gift correlated to a specific official act)); United States v. Bradley, 173 F.3d 225, 231-32 (3d Cir. 1999) (666 prosecution);   United States v. Terry, 707 F.3d at 612; United States v. Ganim, 510 F.3d 134, 147 (2d Cir. 2007). The requirement that there be a payment of a

---

For example, if a party to litigation were to pay a judge money in exchange for a favorable decision, that conduct would-and should-constitute bribery, even if a trier of fact might conclude ex post that the judgment was on the merits legally proper. This principle was at stake and upheld in a decision arising from the most lamentable episode in this court's history. See United States v. Manton, 107 F.2d 834, 845-46 (2d Cir. 1939) (rejecting Chief Circuit Judge's defense that payments in exchange for particular decisions were not obstruction of justice where decisions rendered were legally correct). In such a case, the key element of the offense is the intent of the payor to purchase a particular decision "without regard to the merits," id. at 846, as opposed to an impartial judgment.  The legal merits, or lack thereof, of the judgment rendered is not an element of the offense.

thing of value in return for the performance of an official act is satisfied so long as the evidence shows a "course of conduct" of things of value flowing to the public official in exchange for a pattern of official actions favorable to the payer(s). United States v. Terry, 707 F.3d at 612; United States v. Ganim, 510 F.3d at 147. It is not necessary to prove that a public official had to perform a set number of official acts in return for the payments. What must be shown is that the payments were made with the intent of securing a specific type of official action. United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998). For example, payments may have been made with the intent to retain the official's services on an "as needed" basis, so that whenever an opportunity arose, the public official would take specific actions on behalf of the donor. United States v. Bradley, 175 F.3d 225, 231-32 (3d Cir. 1999); United States v. Terry, 707 F.3d at 612; United States v. Abbey, 560 F.3d 513, 518 (6th Cir. 2009); United States v. Ganim, 510 F.3d 134, 147 (2d Cir. 2007).

        **3.**       **An official act is something "focused and concrete**." Official acts include the decisions or acts generally expected of public officials. It also includes the exercise of both formal and informal influence, such as a legislator's behind the scenes influence. United States v. Hill. 70 F.3d 1280 (9th Cir 1995) (unpublished). Cf, United States v. Ring, 706 F.3d 460, 471 (D.C Cir. 2013) (DOJ attorney's email to INS requesting an expedited review of immigration application was an official act within meaning of federal gratuities statute even though DOJ attorney lacked official power to expedite the review where INS official receiving the email felt he had to act in response to the position of DOJ attorney).

        The U.S. Supreme Court in McDonnell v. United States, 136 S.Ct. 2355 (2016), set explicit limitations on what constitutes an "official act." There, the government charged honest services fraud, 18 U.S.C. § 1346, and Hobbs Act extortion, 18 U.S.C. § 1951(a), after an

individual gave the governor of Virginia over $175,000 in gifts and loans in an effort to influence the governor to cause Virginia's state medical schools to conduct studies on his nutritional supplement in order to obtain FDA approval. The parties agreed that the definition of "official act" in the federal bribery statute, 18 U.S.C. § 201(a)(3), should be included in the jury instruction, which was unusual. The Court held that an official act included "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete," something "focused and concrete." Id. at 2369, 2372. "Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk . . . or to gather additional information, however, does not qualify." Id. at 2372.

After providing the elements of bribery, the government charged the grand jury that for campaign contribution cases:

> Now, for most of the payments, if not all the payments—
> well, all the payments, maybe one, are campaign contributions,
> and they have a special instruction for you. And the reasoning
> behind this is that the government does not want to stop people
> from making campaign contributions, legal campaign contributions
> to individual candidates. They have a first amendment right to do
> that, but here's the instruction.
>
> The solicitation of campaign contributions from any person is
> necessary and permissible form of political activity on the part of
> a person who seeks political office. Thus, the acceptance by an elected
> official of a campaign contribution does not in itself constitute a
> violation of the Hobbs Act or bribery or any of the quid pro quo charges,
> even if the donor has business pending before the official; however,
> if a public official demands or accepts money in exchange for a specific
> request of exercise of his or her official power, such a demand or
> acceptance does constitute a violation of law regardless of
> whether the payment is made in the form of campaign contribution.
>
> So if it's simply there's a campaign contribution, nothing wrong
> with that. If there's some this or that back and forth that the law talks
> about in an explicit agreement, not necessarily an expressed
> agreement, but an explicit agreement, you give me this and I'll give you
> something back on return, then that's a violation of the law.

This instruction is in accord with United States Supreme Court jurisprudence.

In <u>McCormick v. United States</u>, 500 U.S. 257 (1991), the Supreme Court held that making campaign contributions can constitute criminal extortion only when made pursuant to an "explicit" quid pro quo agreement. 500 U.S. at 271-74 (1991). The requirement of an "explicit" quid pro quo was read into the extortion statute to "ensure that an otherwise permissible activity – raising money for candidates and issues supported by the payer – was not unfairly criminalized." <u>United States v. Abbey</u>, 560 F.3d 513, 518 (6th Cir. 2009). The complication arises because the Court did not define "explicit." The Supreme Court's subsequent decision in <u>Evans v. United States</u>, 504 U.S. 255 (1992), also a Hobbs Act extortion case, provided additional guidance as to what properly constitutes an "explicit promise or agreement." In <u>Evans</u>, the defendant was a public official convicted of attempted extortion under color of official right after accepting cash and a campaign contribution from an FBI agent posing as a real estate developer. <u>Evans,</u> 504 U.S. at 257. At trial, the district court instructed the jury,

> The defendant contends that the $8,000 he received . . . was a campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.
>
> However, if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

<u>Id</u>. at 257-58 (internal quotation marks omitted). The Court found that this instruction "satisfie[d] the *quid pro quo* requirement of <u>McCormick</u> . . . , because the offense is completed at the time when the public official receives a payment in return for his agreement to perform

specific official acts." Id. at 268. Furthermore, Evans held that to prove Hobbs Act extortion using the theory of "under color of official right," the government "need only show that the public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," since fulfillment of the quid pro quo is not necessarily an element of extortion. *United States v. Manzo*, 636 F.3d 56, 60 (3rd Cir. 2011), United States v. Menendez, 132 F.Supp. 3d 635, 641 (D.N.J. 2015).

Since McCormick, courts have assessed what level of specificity is required to prove a quid pro quo when bribery cases involve campaign contributions. See United States v. Siegelman, 640 F.3d 1159, 1170-1172 (11th Cir. 2011) (although quid pro quo element requires that contribution be made in return for specific official action, agreement need not be express); United States v. Whitfield, 590 F.3d 325, 349 (5th Cir. 2009) (quid pro quo requirement satisfied in judicial corruption case when specific type of action is agreed upon, rather than a specific case).

The lack of a clear definition from the Supreme Court has prompted defendants in several cases, including this defendant, to argue that "explicit" means that the payor must give a campaign contribution and the public official must receive it with the understanding that the contribution relates to a *specific* official act. According to this argument, vague expectations of some future benefit are not sufficient to convert the contribution into a bribe.

Two cases reviewing the convictions of state judges who received what amounted to campaign contributions have rejected these arguments. In United States v. Whitfield, 590 F.3d 325, 349 (5th Cir. 2009), a case where a trial attorney and two judges were convicted of honest services bribery, the Fifth Circuit ruled that the explicit *quid pro quo* language of McCormick did *not* require the government to prove that the defendants had identified a particular case that

would be fixed. Instead, the Court affirmed the trial court's jury instructions, which correctly

required the government to prove that the defendants had specific intent to give or receive

something of value in exchange for specific *type of* official act to be performed in the future, that

is, "a question, matter, cause or proceeding which may be then or thereafter pending, subject to

the judge's action or judgment." 590 F.3d at 350 (citing United States v. Jennings, 160 F.3d at

1014 (in campaign contribution case, what must be shown is that payment was made with intent

to secure specific type of official action).[4]

        The Sixth Circuit reached a similar conclusion in United States v. Terry, 707 F.3d

607, 612 (6th Cir. 2013), a case also involving the conviction of a state court judge for honest

services fraud and conspiracy to commit honest services fraud.  In affirming the conviction, the

Court concluded that the trial court had correctly instructed the jury that (1) the evidence must

show a *quid pro quo*, that is, an agreement to accept a thing of value in exchange for official

action; (2) a "thing of value" could include a campaign contribution so long as it was received in

exchange for official acts; 3) the intent could be based on the defendant's words, conduct, acts,

and all circumstances and logical inferences; and (4) each payment did not need to be tied to a

specific official act, so long as the defendant understood that he was to take official action

whenever an opportunity was presented to him. According to the court, when campaign

contributions are in issue, it is for the jury to determine from the circumstances whether the

donor made a contribution so the elected official will "do what I asked him to do" and the elected

---

[4] The court explained:

    For example, payments may be made with the intent to retain the official's services on an "as needed"
    basis, so that whenever the opportunity presents itself the official will take specific action on the payor's
    behalf.  This sort of "I'll scratch your back if you scratch mine" arrangement constitutes bribery because
    the payor made payments with the intent to exchange them for specific official action.

    Id. at 1014.

official accepted the contribution with the same understanding. In focusing on the agreement "as the dividing line between permissible and impermissible payments," the court refused to create two definitions for bribery, one for public officials who may accept campaign contributions and another for those who may not, noting that neither the Supreme Court nor Congress sought to distinguish between legal and illegal campaign contributions in the bribery or extortion statutes. In upholding the conviction, the Court rejected the defendant's assertion that McCormick created a higher standard for political contributions to become bribes, reasoning that McCormick did not give elected judges "a First Amendment right to sell a case so long as the buyer had not picked out "which" case at the time of sale."

Searching for requisite *quid pro quo*, the focus remains squarely on evidence of the corrupt agreement between the contributor and the elected official; the intent to exchange something of value for an official act.  The usual rules of gleaning intent from the language of the payor and the official, and the circumstances surrounding the relationship and exchange of favors, apply in assessing whether a campaign contribution is a bribe. United States v. Siegelman, 640 F.3d 1159, 1170-1172 (11th Cir. 2011).  Second, the determination of intent remains squarely a jury question and courts should be loath to disturb this inquiry. The defendant here is asking this Court to overturn the grand jury's informed decision.

**C.**      **Defendant's Motion to Dismiss Count One and Count Nineteen Should Be Denied.**

Defendant Allinson argues that Counts One and Nineteen of the indictment should be dismissed because the conspiracy count:

a.      uses only a single common defendant, Mayor Pawlowski,  to charge otherwise unrelated persons in a single conspiracy;

b.      fails to allege the requisite common illicit goal or mutual support among the co-conspirators;

c.      fails to allege any facts to demonstrate a mutually shared objective;

d.      fails to allege an explicit quid pro quo between Allinson and Pawlowski;

e.      fails to allege a specific official act for the offered item of value;

f.      fails to allege an official act performed by Pawlowski in return for the bribe offered by defendant Allinson.

Because arguments d, e, and f were raised and responded to by the government in the above due process argument, see pages 10-17 supra, the government will not repeat them here.

An indictment is generally deemed sufficient if it (1) contains the elements of the offense intended to be charged; (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989). The indictment need contain no greater specificity than the statutory language "so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.: Rankin 870 F.2d at 112. An indictment is sufficient if it adequately informs the defendant of the charges against him. United States v. Turley, 891 F.2d 57, 59 (3d Cir. 1989). The sole function of a motion to dismiss is to test the sufficiency of the allegations in the indictment; it is not a device to test the sufficiency of the government's evidence. United States v. DeLaurentis, 230 F.3d 659, 660 (3d Cir. 2000). A

motion to dismiss a conspiracy indictment is evaluated under the same standards. <u>See</u> <u>Rankin</u>, 870 F.2d at 113 (quoting <u>United States v. Scanzello</u>, 832 F.2d 18, 22 (3d Cir 1987); <u>United States v. Bailey</u>, 444 U.S. 394, 414 (1980)

The Third Circuit employs a three-step inquiry to determine whether a series of events constitutes a single conspiracy or several unrelated conspiracies. First, it examines whether there was a common goal among the conspirators. Second, it looks at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the coconspirators. Third. it examines the extent to which the participants overlap in the various dealings. <u>See United States v. Greenidge</u>, 496 F.3d 85, 93 (3d Cir. 2007); <u>United States v. Kelly</u>, 892 F.2d 255, 259 (3d Cir. 1989).

In this case, there was a common goal among co-conspirators Pawlowski, Fleck, Ruchlewicz, Dougherty, and Allinson to make, and cause others to make campaign contributions to Pawlowski, in return for which they received, and anticipated receiving, favorable treatment from Pawlowski in obtaining contracts with the City of Allentown[5]. <u>See</u> ¶ 33. Additionally, the continuous cooperation of the co-conspirators was necessary to guarantee continuous results, as is evidenced by Overt Acts 113-132, where over the course of three years, Allinson, Ruchlewicz, and Fleck discussed potential contributions to Pawlowski by Allinson and his law firm, and the expected resulting contracts that would go to Allinson and his law firm, in numerous conversations. The agreement to make campaign contributions for contracts and to provide

---

[5]     The government need only prove that the defendant agreed with at least one of the persons named in the indictment that they or one of them would perform an unlawful act. Failing to prove that all named co-conspirators conspired with the defendant is not fatal to the government's case. <u>United States v. Whiteford</u>, 676 F.3d 348, 357 (3d Cir. 2012) (quoting <u>United States v. Kelly</u>, 892 F.2d 255, 259 (3d Cir. 1989)

contracts for campaign contributions would fail if either side of the equation failed to perform. Lastly, the indictment makes clear that the above listed co-conspirators and their actions clearly overlapped during the time period of the conspiracy.

Lastly, the defendant argues that Count Nineteen, charging federal program bribery-offering, did not sufficiently plead a quid pro quo. The defendant is wrong. The Count alleges that Allison corruptly gave, offered to give, agreed to give, caused, and attempted to cause others to give campaign contributions to Pawlowski with the intent to influence and reward Pawlowski in connection with legal services contracts from the City of Allentown. Nothing more is necessary in the indictment.

Furthermore, in the federal context there does not have to be an actual exchange because bribery also includes offers and solicitations of things of value in exchange for official action. United States v. Wright, 665 F.3d 560, 568 (3d Cir. 2012). This means that the payor commits bribery if he offers something of value to the public official in exchange for official action whether or not the public official actually accepts the thing of value or agrees to perform the official act. For the public official, bribery includes the public official's solicitation or agreement to accept a thing of value in exchange for official action, whether or not the payor actually provides the thing of value, and whether or not the official ultimately performs the official act or intends to do so. This puts the focus on the intent to affect an exchange of value for official action. United States v. Wright, 665 F.3d at 568 (intent is the determinant).

For all the above reasons, the defendant's motion to dismiss the indictment should be denied.

D.    **Defendant's Motion for Severance Should Be Denied**

Defendant Allinson argues that because he is only charged in two counts of the indictment, there may be a spillover of evidence and guilt by association in a joint trial. He further alleges that the jury may not be able to compartmentalize the evidence and that <u>Bruton</u> issues may arise concerning the statements of co-conspirator Edwin Pawlowski. The defendant's motion should be denied.

There is a preference in the federal system for joint trials of defendants who are indicted together," as joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993) (internal quotation marks and citation omitted); <u>United States v. Eufrasio</u>, 935 F.2d 553, 568 (3d Cir.1991). Accordingly, district courts should grant severance under Federal Rule of Criminal Procedure 14(a) "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>United States v. Balter</u>, 91 F.3d 427, 432 (3d Cir.1996) (internal quotations omitted).

Courts have previously noted that, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial and by themselves do not warrant a severance.... [P]rejudicial spillover warranting severance is, in general, an unlikely occurrence when all the defendants are charged under the same conspiracy count." <u>United States v. Forde,</u> 699 F. Supp.2d 637, 644 (S.D.N.Y. 2010) (citing <u>United States v. Salameh</u>, 152 F.3d 88, 115 (2d Cir.1998)). Defendants seeking a severance bear an especially "heavy burden." <u>*United States v. Console*</u>, 13 F.3d 641, 655 (3d Cir.1993). "[D]efendants are not entitled to a severance merely because they may have a better chance for an acquittal in separate trials" or because of a possibility of prejudice. <u>Urban</u>, 404 F.3d at 775. <u>See also United States v. Walker,</u> 392 Fed. Appx. 919, 926 (3d Cir.2009) (rejecting arguments for severance that "evidence was so

horrific it had to spillover into the jury's mind" and that "specter of violence against witnesses was highly prejudicial").  Instead, in order to obtain a severance, a defendant must demonstrate that "not only would the court abuse its discretion if it denied severance, but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial."

This Court will undoubtedly instruct the jury to consider each defendant separately and to consider the evidence against each defendant on each offense charged.  A proper instruction will remedy any potential prejudice from a joint trial. Zafiro, 506 U.S. at 540; Lore, 430 F.3d at 206.  Here, the facts are not so complex that a jury could not compartmentalize the elements of each charge, and there is no reason to believe that the jury would have difficulty segregating and considering the relatively simple facts as they pertain to each distinct count.  See Lore, 430 F.3d at 205-06 (finding that segregation was not necessary when the counts in an indictment were "relatively straightforward and discrete, not involving overly technical or scientific issues").

The defendant does not identify any statements of Pawlowski that he argues would be subject to a Bruton analysis.  In fact, it appears that Pawlowski's statements, as well as Fleck's and Ruchlewicz' statements before they began cooperating with the government, would be co-conspirator statements, all admissible under Fed.R.Evid. 801(d)(2)(E).

Lastly, even if severance was granted here, the government submits that it could present much, if not all, of the same evidence that will be presented in a joint trial, to show the intent of co-conspirators Pawlowski, Fleck, Ruchlewicz, Dougherty, and Allinson.

For all the above reasons, the defendant's motion to sever should be denied.

## A. CONCLUSION

For all of these reasons, the defendant's motions to dismiss and sever should be denied.

Respectfully submitted,

LOUIS D. LAPPEN
United States Attorney

_s/Anthony J. Wzorek_____
ANTHONY J. WZOREK
MICHELLE L. MORGAN
Assistant United States Attorneys

Dated: November 17, 2017

## **CERTIFICATE OF SERVICE**

I hereby certify that I served a true and correct copy of the foregoing on this date,

by electronic mail, and by filing on ECF upon the following:

William J. Winning,
wwinning@cozen.com
Counsel for Scott Allinson

Megan S. Scheib, Esq.
mscheib@cozen.com
Counsel for Scott Allinson

Jack J. McMahon, Jr., Esquire
mcmahonlaw@hotmail.com
Counsel for Edwin Pawlowski

James M. Polyak, Esq.
jmpolyak@polyaklawoffice.com
Counsel for James Hickey

Robert Goldman, Esq.
reg@bobgoldmanlaw.com
Counsel for James Hickey

s/Anthony J. Wzorek
ANTHONY J. WZOREK
MICHELLE L. MORGAN
Assistant United States Attorneys

Date: November 20, 2017